2015 IL App (1st) 110415

SIXTH DIVISION
September 11, 2015
Modified Upon Denial of Rehearing October 16, 2015

No.  1-11-0415

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 07 CR 12118 |
| | ) | |
| MICHAEL PACE, | ) | |
| | ) | Honorable Nicholas Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE DELORT delivered the judgment of the court, with opinion.
Justices Cunningham and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Michael Pace appeals the trial court's denial of his motions to vacate his guilty plea and reconsider sentence.  On appeal, he contends that the trial court committed reversible error by (1) considering its personal beliefs and private investigations during the sentencing hearing; (2) exhibiting bias against him; (3) improperly considering his declination to speak in allocution; (4) considering improper evidence; (5) failing to consider mitigating evidence; (6) improperly questioning a defense witness during a hearing on his motion to vacate his plea; and (7) failing to properly admonish him pursuant to Illinois Supreme Court Rule 402(a) (eff. July 1, 1997).  In addition, he contends that the automatic transfer provision of the

Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/5-130 (West 2006)) and the application of the 25 years-to-life mandatory firearm enhancement and consecutive sentencing statute violate the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). We affirm in part, reverse in part, vacate defendant's sentence and remand with instructions.

¶ 2                                    BACKGROUND

¶ 3      On June 15, 2007, defendant was charged in a 29-count indictment with first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2006)), attempted first degree murder (720 ILCS 5/8-4 (West 2006)), and aggravated battery with a firearm (720 ILCS 5/12-4.2 (West 2006)). Defendant was 16 years old at the time he committed the offense. Due to the nature of the offenses, his case was transferred to adult criminal court pursuant to the automatic transfer provision of the Juvenile Court Act. 705 ILCS 405/5-130(1)(a) (West 2006). On June 19, 2009, defendant entered into a blind guilty plea whereby he plead guilty to one count of first degree murder, one count of first degree murder in which he personally discharged a firearm that proximately caused death, and two counts of aggravated battery with a firearm.

¶ 4      After defendant announced his intent to enter a guilty plea, the trial court furnished him with several admonishments. The court began by admonishing defendant about the sentencing ranges applicable to him. The court specifically informed defendant that the sentencing range for first degree murder was 20 to 60 years' imprisonment, that the sentencing range "[o]n the charge of Personally Discharging a Firearm Which Proximately Caused the Death of Blair Holt" was 25 years to life in prison, and that the sentencing range for aggravated battery with a firearm was 6 to 30 years' imprisonment. After informing the defendant of the range applicable to each offense, the court asked defendant if he understood. Defendant answered "yes" each time.

¶ 5    Next, the court admonished defendant about the nature of a blind guilty plea.  The court explained that there was no agreement between defendant and the State or the court regarding what sentence would be imposed.  The court asked defendant if he understood and still wanted to plead guilty and defendant answered affirmatively.

¶ 6    The court then admonished defendant about the nature of the rights he would be relinquishing by pleading guilty.  The court explained that defendant had a right to plead not guilty and force the State to prove him guilty beyond a reasonable doubt.  The court then informed defendant that he had right to a jury trial.  The court explained what a jury was, how it functioned, and that a jury's verdict must be unanimous.  After each of these admonishments, defendant indicated that he understood.  Defendant then signed a jury waiver form, at which point the court stated "[b]y signing that you are indicating to me in writing that you understand that you're waiving your absolute right to trial by jury, do you understand that?"  Defendant replied "yeah."

¶ 7    Next, the court informed defendant that he had a right to a bench trial, and it explained to defendant what a bench trial was.  The court also told defendant that by pleading guilty he was giving up his right to confront witnesses against him and subpoena witnesses to testify on his behalf.  After each of these admonishments, defendant indicated that he understood.

¶ 8    The court then inquired into the voluntariness of defendant's plea by asking whether defendant's decision to plead guilty was made of his own free will and whether the plea had been induced by any threats, force or promises.  Defendant answered "yes" and "no," respectively.

¶ 9    The State then presented the following factual basis for defendant's plea: Around 3 p.m. on May 10, 2007, a Chicago Transit Authority (CTA) bus stopped at Julian High School (Julian).  Several students who had been released from Julian for the day boarded the bus, including Blair

Holt, Christine Coley, and Megan James. The bus began travelling west on 103rd Street towards Halsted Street.

¶ 10    While the bus traveled towards Halsted Street, defendant and some other friends were at Mt. Vernon Park near 105th Street and Aberdeen Street. At that time, they formed a plan to "go get" rival gang members whom they believed were travelling on the bus. One of defendant's friends, Kevin Jones, gave defendant a gun and a hoodie. The group then walked to a bus stop at 103rd Street and Halsted Street and waited outside a currency exchange for the bus to arrive.

¶ 11    When the bus approached, defendant peered inside and then ran onto the bus at the front entrance. Standing by the driver's area, defendant took out the handgun and fired several shots into the crowd of people on bus. Several people were struck by defendant's gunfire, including Coley, who suffered gunshot wounds to her chest and arm, James, who suffered a gunshot wound to her knee, and Holt, who suffered a gunshot wound to his abdomen. Coley and James survived, but Holt died from his wounds later that day.

¶ 12    After firing the shots, defendant fled to the area around 105th Street and Aberdeen Street. There, he told a person named Jimmie Malone that he had "just laid down the murder game." Defendant then left the area.

¶ 13    Surveillance video from outside the 103rd Street currency exchange showed defendant waiting for the bus and pulling the gun out. Surveillance video from onboard the bus showed defendant entering the bus, firing the gun, and then exiting. Police captured still images from the bus's surveillance video. A police officer took one of the images to Julian, where an attendance officer identified defendant. Defendant turned himself in on May 12, 2007.

¶ 14    After finding that defendant's plea was supported by a factual basis, the court found defendant guilty and entered judgment against him. The court then admonished defendant for a

second time regarding the sentencing ranges he was facing and the fact that there was no agreement about what sentence he would receive. Defendant again indicated that he understood the admonishments.

¶ 15    The court conducted a sentencing hearing on July 20, 2009. In aggravation, the State presented testimony from Detective Neil Maas, Coley, James, and victim impact statements from Holt's parents, Ronald Holt and Annette Nance Holt.

¶ 16    In mitigation, the defense presented testimony from Dr. Robert Hanlon, whom the parties stipulated was an expert in neuropsychology. Dr. Hanlon testified that he met with defendant in May 2008 in order to conduct a neuropsychological evaluation. The evaluation revealed that defendant had an IQ of 77, which according to Dr. Hanlon was in "the borderline range of intelligence." He explained that meant defendant was "above the mental retardation range, but below the low average range." The evaluation also showed that defendant had a "nonverbal learning disorder." Dr. Hanlon explained that a nonverbal learning disorder "involves impaired perceptual abilities and deficient spatial processing[]" and can lead to "difficulty in perceiving and interpreting gestures, nonverbal communication, [and] facial expressions." He noted that such disorders have "a significant academic impact on school performance" which leads to difficulty "forming and understanding *** the abstract meaning of things and drawing inferences." He also noted that individuals with such disorders experience emotional problems, stating "many of these kids generally are frustrated, and they are often angry and often depressed. They tend to act out. They're compulsive, and they have poor social judgment." Dr. Hanlon believed that defendant's learning disability "very likely" affects his judgment and socialization.

¶ 17    On cross-examination, Dr. Hanlon testified that he believed defendant knows right from wrong "in many cases." He also conceded that he stated in his report that defendant's "thought processes were logical, linear, and goal directed" and that he did not find evidence that defendant had a "thought disorder or psychotic thought content or severe mood disorder or marked anxiety."

¶ 18    After the State finished its cross-examination, the following colloquy took place between the court and Dr. Hanlon:

> "THE COURT: Doctor, you talked a little bit about socialization in your evaluation of Mr. Pace; is that correct?
>
> THE WITNESS: Yes.
>
> THE COURT: Are people who suffer from nonverbal learning disorders such as his often isolated within communities?
>
> THE WITNESS: Often ***. Particularly, if there are limited socio-economic advances for such students, they are often isolated.
>
> THE COURT:  Were you aware from your evaluation of Mr. Pace that he was a self-admitted member of a street gang?
>
> THE WITNESS: I'm aware that he had some gang affiliation.
>
> THE COURT: Wouldn't his social interaction and general behavior during the course of this incident in some ways detract from your assessment of him as having a disability that would prevent him from socializing?

In other words, communal acts, long term membership in a gang, don't these things sort of run in the face of your evaluation of him having an issue regarding his ability to socialize?

THE WITNESS: Well, I think *** as you're describing it, we're getting at a difference between a disability and an inability. I'm not saying that he had the total lack of ability for any of the things I have discussed. I'm saying he's just not functioning at a normal level in most of those demands.

THE COURT: So would you say he would have exceeded his disability in joining a gang and being involved in these communal efforts?

THE WITNESS: Could you re-ask the question?

THE COURT: Would you say he exceeded his ability when he joined a gang and succeeded in interacting with his associates here during the course of this event?

You have described him as intellectually limited; is that correct?

THE WITNESS: Correct.

THE COURT: You said that he had a nonverbal language disorder that would have had definite reflection upon his ability to socialize; is that correct?

THE WITNESS: It would be, yes.

7

THE COURT: All right. Now knowing that he was a member of a gang over time and knowing also that he engaged in a complicated effort to execute a person on a bus in the City of Chicago, would these things be inconsistent with the level of disability that you're indicating that he possesses?

THE WITNESS: Not inconsistent. I think he probably joined a gang because of his limitations, and he found some support and admiration by that gang affiliation, and I think that commonly occurs.

THE COURT: Can you think of any other reasons why someone would join a gang other than the reason you just gave?

THE WITNESS: Money.

THE COURT: Any questions based on that, Miss Danahy or Mr. Mahoney?

MR. MAHONEY [Assistant State's Attorney]: No.

MS. DANAHY [Assistant Public Defender]: No.

THE COURT: Thank you, Doctor."

¶ 19    After the live testimony concluded, the court offered defendant the opportunity to speak in allocution. Defendant declined. The parties then offered arguments in aggravation and mitigation. The State, emphasizing the facts of the crime and noting that this case was "every parents' nightmare," asked the court to impose a lengthy sentence.

¶ 20    In mitigation, defense counsel explained that defendant's intended victim was a rival gang member named Jerome Kraft who was riding the bus which defendant boarded. According

to defense counsel, defendant and Kraft were involved in an ongoing feud in which Kraft had tried to shoot defendant. Defense counsel argued that "in [defendant's] 16 year old, 77 I.Q. mind, [Kraft] was coming after him. [Kraft] was on the bus by the back door making gestures at Michael." Defense counsel then told the court that defendant had expressed remorse to her. Defense counsel emphasized that defendant's youth was a mitigating factor, and also pointed out that defendant had a learning disability, history of substance abuse, difficult upbringing, and no criminal record.

¶ 21 The trial court then announced its sentence. The court began by explaining that it would consider: (1) the facts of the case; (2) the presentence investigation; (3) the evidence in aggravation and mitigation; (4) the statutory factors in aggravation and mitigation; (5) the financial impact of incarceration; (6) sentencing alternatives; (7) the victim impact statements; and (8) "the defendant's right of allocution, which he did not avail himself of."

¶ 22 The trial court then offered the following remarks:

> "I, like most of you, wake up each morning and walk out and take the paper off my steps. I, like most of you, have been saddened by what's going on in our city. A lot of mornings I wake up and walk my daughter to a public school in this city, not, of course, over the course of the summer.
>
> So when I talk about the affects that this crime or that my sentence will have on us as a society, I'm talking from my own personal experience, which I will bring to bear on what I think is the appropriate sentence in this case. And that is experience which

9

has had a shadow cast over it like a lot of you here today. There is, simply put, too much gang violence on our streets.

These facts, the facts of this case, are the most unimaginable that a parent can face. I know that on the date that Blair Holt was killed, his parents kissed him good-bye and told him they loved him. I know that all of the parents that put their children on that bus or placed their children in Julian High School had a right to know that their children would be protected, that their children would be safe.

I know for a fact that even in the most economically challenged corners of our city, that only one or two percent of the population make the lives of those there miserable by their conduct. That's in the worst, unimaginable neighborhoods within the City of Chicago. Only one or two percent of the population is involved in making our lives worse. They are the headlines that greet me each morning.

There are many, many people in public housing in economic circumstances with difficult economic and educational backgrounds that never cross the threshold into the building here at 26th and California. These are facts I know and facts that I will consider in conjunction with sentencing in this circumstance."

¶ 23    The court then commented on the surveillance footage showing defendant's crime, stating:

"But when those children said good-bye to their families – and as I watched the video here, as I imagined the thoughts and prayers of the parents of these children on that bus and watched the man before me here today mount the steps to that bus, buses that I have mounted my whole life, buses that I have mounted with my daughter, I imagined the horror that must have confronted them, and it is extremely apparent from looking at the video of the carnage that happened on Bus 103 leaving Julian High School."

¶ 24    The court then discussed what it hoped defendant's sentence would accomplish, stating:

"It is unconscionable and it has no quarter in our city. And if in making my sentence today I can do one thing, it would be the hope that all of us look out our windows at the people around us and ask ourselves whether or not we've done everything we can to make it better, whether or not we've been vigilant with our sons and daughters to make sure that they are not involved in any illegal misdeeds out there, to make sure that they are not members of street gangs like this man, to make sure that they know that the people out there that are involved in these sorts of things like Mr. Pace know that they're being watched by all of us, the other 99 percent. Because they are.

And a failure to act and a failure to be involved in the lives of your children and a failure to not intervene and act out and point out to the police and to authorities what you see happening and

when you see something criminally happening is a failure that we all have to live with.  And it is one that I'm hoping my sentence here today will remind everyone is the duty of every citizen, to act and to act in a way that will help stop and curb what's going on out there."

¶ 25    The court then commented on the blamelessness of defendant's victims, stating:

"[I]n this circumstance, I don't have some fellow gang member standing across the street that's the victim in this case.  I don't have that.  I don't – none of the three victims in this circumstance were in any way complicit in what happened to them.

* * *

*** The Holts, whose Victim Impact Statement I will consider during the course of my statement, and their son and the two young women that testified here moments ago did nothing to facilitate or any way contribute to what happened to them, not one thing.

And the parents, and particularly the Holts and also to the other parents that had to know that that horror was inflicted upon them knowing that they have done everything correctly as best they could to ensure the safety of their children is revolting.  In every way.

As I said, they didn't do anything to deserve the outcome in this circumstance.  Blair Holt didn't do anything to deserve the

outcome in this circumstance.  He was just somebody that was riding a bus."

¶ 26    The court then  discussed Dr. Hanlon's testimony, stating:

"I have heard factors in mitigation in this case.  I heard from Dr. Hanlon.  And I have heard from doctors like Dr. Hanlon before.  And what *** my experience of their testimony, and I will consider it, are that in some ways Mr. Pace can find refuge in education that wasn't going well.  It seems – at least it's the doctor's opinion that he suffered from a lower I.Q. than most and that he didn't do well in school.

I don't think there's anything Mr. Pace's family could have done to prevent that.  But here again, this isn't an uncommon disability.  Difficulties in school aren't uncommon either.  Children in our schools right now and even those that go on to attend college have confronted learning disabilities in early age.  I'm not going to paint them with the brush that the doctor would.

And I have to say as a matter of fact that I'm weary tired of watching doctors, psychologists walk into my courtroom and somehow try to provide some shade for the conduct of a person like Michael Pace.  Because it's a disservice to all the people they see during the course of their careers that don't do it.

You think that he hasn't had the same diagnosis for some kid from Deerfield or some other child that never did anything

wrong in their life that grew up in Englewood? And yet,
somehow, I'm supposed to sit here and think that that is some
reason, that is some mitigation that somehow takes the terrible
stain of his conduct away from him. And that is unpalatable in the
extreme."

¶ 27    The court then considered defendant's presentence investigation (PSI). The PSI indicated that defendant's mother and father never married and that his father was incarcerated. In addition, the court noted that according to the PSI, defendant had the words "I'm a beast" and "I'm a dog" tattooed on right and left hands, respectively. The court stated that it doubted that those tattoos "escaped any parent's eyes." The court also noted that the PSI indicated that defendant said that he was a member of the Gangster Disciple street gang "but grew up under it" and that "[i]t was really no gang to me. It was more of a movement." In response to those statements, the court said that defendant seemed to be "exud[ing] a certain degree of pride, which leads me back down the road of questioning how closely he was ever watched." The court then found that defendant was a member of a gang, stating:

"What I see in those tattoos and what I'm hoping
everybody else sees is that too many of us are dedicated to
violence, too many of us are dedicated to revenge, too many of us
are dedicated to solving problems with a handgun rather than the
way that the rest of us do it. That one percent haunts us like a bad
dream every day. They do it on the steps of churches and they do
it on buses leaving Chicago public schools."

¶ 28    The court then said the following:

14

"It will be my job to remove one small part of that one percent, but there are many more of them out there, and if anyone is looking through their paper, like I do every morning, tomorrow morning I hope they read this and understand that all of us have to be vigilant and understand that every child, no matter what community they come from, is really all of our children, whether they're Chicago Public School students, whether they attend Leo High School or Loyola Academy, whether they attend Julian or Lane or Whitney. All of us have to understand that we can only be as strong as protecting them shows, and that responsibility begins with looking out your window and thinking about the people around you."

¶ 29 The court then referred to Holt and his family, as well as Coley, the bus driver, the police detectives, physical therapists and hospital staff who treated Coley and James, the State's Attorneys, and public defenders as members of the "99 percent" and "heroes." The court stated, however, that when it looked at defendant, it did not see "a victim, some person that was in any way trying to defend himself." Instead, according to the court, defendant was "in that one percent, that makes a life for the rest of us a living hell." The court declared that defendant was "not going to define the city that I'm from. The Holts, their son, the other children on that bus, they define who I am." Continuing on, the court stated:

"And there aren't enough bullets being made to silence the voices. No amount of guns and no amount of young punks and no amount of gang members are ever going to find enough dark

corners and dark alleys to hide in, because there are way, way

more of us than there are of them."

¶ 30    After finishing its remarks, the court sentenced defendant to consecutive prison terms of

35 years for first degree murder, with an additional 25 years added due to the mandatory firearm

enhancement, and two 20 year prison terms for each aggravated battery with a firearm, resulting

in an aggregate sentence of 100 years' imprisonment.  In its closing remarks, the court stated "it

is my hope that this sentence serves two masters.  One, that it is retributive, and, two, that it is a

message to those people in those dark alleys *** that people like you and I outnumber them by

thousands and millions."

¶ 31    Defendant then filed a motion to reconsider sentence.  A hearing on defendant's motion

was held on July 21, 2009.  At the hearing, the court stated, "I do want to indicate that I felt there

was mitigation here.  In my finding yesterday I didn't say that there wasn't."  The court

explained that it took into account the fact that defendant pled guilty, but that it also considered

the fact that defendant did not speak in allocution or express remorse.  In somewhat

contradictory fashion, however, the court then stated that defendant's decision to remain silent

during the sentencing hearing did not affect his sentence.  Instead, the court explained that

"[w]hat I heard, what happened and the other statutory and non-statutory factors both in

aggravation and mitigation are what made his bed.  Elocution or no elocution, he was going to be

in the area in which he ends up finding himself."  At the conclusion of the hearing, the court

denied defendant's motion to reconsider sentence.

¶ 32    On August 6, 2009, defendant filed a notice of appeal.  On August 17, defendant filed a

*pro se* motion to vacate his guilty plea.  A public defender was appointed to represent defendant

and withdrew defendant's notice of appeal.  On May 6, 2010, defendant, through counsel, filed

an amended motion to vacate his guilty plea arguing that his guilty plea was not knowing and voluntary because (1) his low I.Q. precluded him from understanding the court's admonishments and (2) the admonishments he received were legally deficient.

¶ 33    The court held a hearing on defendant's motion on January 6, 2011. At the hearing, defendant presented testimony from Dr. Linda Grossman, whom the parties stipulated was an expert in forensic psychology. Dr. Grossman reviewed Dr. Hanlon's notes and report, the raw data his report was based on, his testimony, as well as defendant's educational records and a transcript of the admonishments which the trial court gave to defendant before it accepted his guilty plea. In reviewing these materials, Dr. Grossman observed that defendant had difficulty learning and suffered from developmental disabilities. She also confirmed that Dr. Hanlon correctly scored defendant's I.Q. at 77, and she learned that defendant had less than a fifth grade ability in verbal capacities "including reading, sentence *** comprehension, reading comprehension, [and] spelling."

¶ 34    When asked about "auditory-verbal encoding," a term which Dr. Hanlon used in his report, Dr. Grossman explained that it meant "difficulties in abstracting meanings from words or sentences presented orally." She explained that the term applied to defendant because he has "numerous difficulties understanding verbal material" and would have an easier time understanding information if it were presented to him in written form rather than verbally. Dr. Grossman then testified that "[t]o a reasonable degree of psychological certainty, it's my opinion that Mr. Pace's intellectual limitations and verbal limitations are inconsistent with an ability on his part to understand the admonishment as it was given to him verbally in court."

¶ 35    On cross-examination, Dr. Grossman admitted that she stated in her report that defendant's limitations were inconsistent with his ability to understand the admonishments as

17

written. She also conceded that reading ability is different than the ability to understand verbal communication and that someone who cannot read may possibly nonetheless be able to understand verbal admonitions. She clarified, however, that "the words that were written but were said to him aloud, exceed his vocabulary by quite a bit." She also admitted that she did not personally meet defendant.

¶ 36 On redirect, Dr. Grossman explained that it was not necessary to interview defendant because she had access to "all of the preceding tests and raw data" that she used to "rescore and check for accuracy." The following colloquy then took place between defense counsel and Dr. Grossman:

> "Q. [DEFENSE COUNSEL:] Now, also, as far as the
>
> spoken word, you also testified on direct about this auditory-verbal
>
> encoding, correct?
>
> A. Correct.
>
> Q. Now, exactly what does that mean in regards to a person
>
> being able to comprehend something spoken as opposed to
>
> comprehending something as he reads it?
>
> A. It refers to the inability or impairment of the ability of
>
> somebody who abstract the meaning or synthesize the meaning of
>
> words or sentences presented orally or received auditorily.
>
> Q. So that a person such as Michael, and I want you to be
>
> clear to the Court, so a person such as Michael will have an easier
>
> time understanding something if he read it as opposed to just
>
> listening?

18

A. It's my opinion that he would."

Immediately thereafter, the following colloquy took place between the court and Dr. Grossman:

Q. [THE COURT:] Wouldn't that be the case for everybody?

A. No, Your Honor, it wouldn't be the case for everything.

Q. Well, I mean, so you're telling me if [*sic*] wouldn't be the case that everyone who read something and then heard it aloud wouldn't benefit from having read it first or you can even juxtapose the two?

A. That's not what I'm hearing here.

Q. That's the question I asked you, though, Doctor, and it's a pretty simple one –

A. I think the answer would –

Q. – wouldn't that be the case for everyone?

A. – yes. I think the answer would be yes to that question.

Q. Yes, okay.

Additional question, is this a common practice for you to just come to a legal conclusion predicated solely on the diagnostic information provided from another psychologist?

A. I didn't put it on the diagnostic, I looked at the raw data, and that would be –

Q. So you just looked at somebody else's scores and you gave –

A. I rescored the test, and reinterpreted them. I found that —

Q. Did you make any inquiry of the woman that represented Mr. Pace about whether or not she had done any educational work of Mr. Pace prior to the time the plea was done so that these words when they arose, that you're saying that he didn't understand them, could have been understood?

A. No, sir.

Q. Would you consider that to be inquiry that might have been made?

A. I have never made that type of inquiry before.

Q. Have you testified like this before on other people's reports?

A. Yes, I have.

Q. Wouldn't the most accurate information come from the person that your [*sic*] rendering opinion on themselves rather than some static data from another source?

A. That would take into account someone else's judgment of his abilities?

Q. That's not the real question. I'm asking, if you're trying to tell me that you have an understanding of Mr. Pace's linguistic abilities and that understanding is solely predicated on diagnostic material generated by another psychologist, wouldn't

you want to supplement, I mean, for example, he could have gone through some organic circumstances after he took the test but before you got him, that would have meant that he understand even more poorly on the date that he entered the plea. Do you follow me?

A. Yes.

Q. How long before the plea was the most recent psychological examination?

* * *

A. The report was in September of 08', the testing was in May of 08'.

Q. And the plea was when?

MR. LANDRUM [DEFENSE COUNSEL]: May I, Judge?

THE COURT: Let me finish this out and then everybody who has questions, they can ask.

THE WITNESS: *** I don't know the date.

Q. That in and of itself is an important factor, wouldn't you think, Doctor?

A. I just don't have access to it right now.

Q. The reason I'm asking you this is because if it was a long period of time in which somebody would have spoken to him about the possibility of pleading guilty and what the

admonishments would be, that might affect, in real terms, his ability to understand what was going on, would it not?

A. It might."

¶ 37　Upon further redirect, Dr. Grossman explained that she based her conclusions on raw data and that the raw data for defendant "was constant among three different testings taken over years apart. It was always the same result."

¶ 38　On recross, Dr. Grossman conceded that Dr. Hanlon's report stated that defendant's verbal I.Q. was 84, which is "higher than borderline range." She also conceded that the report found that defendant's "definitive verbal formulation and vocabulary were in the mildly effective range" and his "verbal concept formation and abstraction were in the low average range."

¶ 39　The following colloquy then took place between the court and Dr. Grossman:

"Q. [THE COURT:] Well, Hanlon's reports were, you said when, again, I'm sorry?

A. [DR. GROSSMAN:] It was issued 9-16-08.

Q. What test or material did you look at that preceded that and by how far did it precede it?

A. I saw the material from 2003 on, I believe, but I can figure it out. I saw documentation from 2003, 2004, 2005, 2007.

Q. What was the source of that documentation?

A. The school records, the disability records, the previous – the IEP records.

Q. And did you reanalyze that data?

A. I did not because all three of the IQ tests were exactly the same, within two points of each other.

Q. Even on the verbal?

A. Yes, had there been a discrepancy, I would have probably looked more closely.

Q. What was the nature of his basis for receiving Social Security?

A. Disability on the basis of a low IQ and specific learning disability.

* * *

It was called various things in the records. In Dr. Hanlon's it was called nonverbal learning disorder.

Q. Nonverbal?

A. Yes.

Q. What else is it called?

A. Nonspecific learning disorder, there was – it was called various names. But always there is records since 2003 of a learning disorder for which he received entitlements and documentation of the same IQ over those years.

Q. And that disability would have been predicated on the opinion of a psychiatrist or medical doctor?

A. Probably a psychologist, but I don't know that for sure.

Q. You don't know?

A. I don't know that for sure under oath, but it was probably a psychologist.

THE COURT: Anything else?

MS. MAHONEY: No.

THE COURT: Counsel?

MR. LANDRUM: No, Judge.

THE COURT: Thanks, Doctor, have a good day.

THE WITNESS: Thank you."

¶ 40    After Dr. Grossman's testimony concluded, the defense rested. The State then presented testimony from Dr. Stafford Henry, whom the parties stipulated was an expert in forensic psychiatry. Dr. Henry testified that he was retained by the State to perform a psychiatric evaluation of defendant and offer opinion regarding defendant's ability to understand the consequences of entering into a blind guilty plea in June 2009. To conduct his evaluation, Dr. Henry reviewed the transcripts of defendant's plea and sentencing hearings, reports generated by Dr. Hanlon and Dr. Grossman and their testimony, records from the Chicago police department and Chicago public schools, and defendant's PSI. In addition, Dr. Henry also conducted a three hour face-to-face interview with defendant on September 15, 2010.

¶ 41    The bulk of Dr. Henry's testimony concerned his interview with defendant, during which time defendant was asked to summarize or explain the admonishments he received from the trial court. The testimony elicited from Dr. Henry by the State on direct examination is irrelevant to the legal issues raised by defendant in this appeal, although we note that based in large part on the interview, Dr. Henry concluded "to a reasonable degree of medical and psychiatric certainty *** that at the time of the June 2009 plea hearing, [defendant] understood the nature and purpose

of the proceedings against him, that [defendant] had a complete and total comprehension of the terms and conditions of a blind plea and that he was cognizant of the potential ramifications of entering such a plea."

¶ 42     On cross-examination, Dr. Henry testified that during the interview, defendant explained that he understood that the sentencing parameters for the firearm enhancement were disjunctive, *i.e.*, that the trial court could sentence him to 25 years *or* life in prison.  Dr. Henry attempted to clarify that his "understanding" of what defendant said was that defendant understood "that the range was between 25 to life in prison ."  He admitted, however, that defendant's actual explanation of the admonishment was "I can get 25 years or life."

¶ 43     On January 20, 2010, the trial court denied defendant's motion to vacate his plea.  On July 22, 2013, this court vacated the trial court's order denying defendant's motion to reconsider sentence because the motion was not accompanied by a certificate of compliance as required by Illinois Supreme Court Rule 604(d) (eff. Feb. 26, 2013).  *People v. Pace*, No. 1-11-0415 (2013) (unpublished order under Supreme Court Rule 23).  Defendant, through counsel, filed a new motion to reconsider sentence on September 18, 2014, arguing that the 100-year sentence was improper because the court (1) based its decision on personal observations, subjective beliefs, outside news reports, and generalized notions about youth violence; (2) abandoned its role as neutral arbiter by cross-examining Dr. Hanlon; (3) improperly drew an adverse inference that defendant lacked remorse based on his decision to not speak in allocution; and (4) failed to give appropriate weight to mitigating factors and defendant's rehabilitative potential.

¶ 44     The court held a hearing on defendant's motion on December 15, 2014.  During the hearing, the court again explained the reasoning behind its sentencing decision, stating:

"[T]he sentence was given to reflect the magnitude of the action he took. And that's it. I tried to see my way to hope that he could find some rehabilitation.

But at a 57 year minimum sentence that couldn't have been a concern of the state legislature. And it's appropriate that it wouldn't be under a crime like this.

This is a brutal offense. It was a brutal offense. And the brutality of it is clear as day when you look at the video, and when you listen to the young women that were shot and you watch what defendant did.

I have compassion for his circumstances. He performed poorly in school. I have compassion for his economic circumstances. There are a thousand young men and women confronting the same things that he confronted that day and that take a different path.

And this sentence is for them as much as it is for the people that he struck that day."

¶ 45    At the conclusion of the hearing, the court denied defendant's motion. This appeal followed.

¶ 46                              ANALYSIS

¶ 47    Defendant presents five arguments on appeal. First, he contends that the trial court erred during the sentencing hearing by (1) considering its personal beliefs and private investigations; (2) abandoning its role as neutral arbiter by cross-examining Dr. Hanlon; (3) punishing the

defendant for declining to speak in allocution; and (4) failing to consider mitigating evidence. Second, he argues that the trial court violated his right to due process by cross-examining Dr. Grossman during the hearing on his motion to withdraw his guilty plea. Third, he argues that his guilty plea was not knowing and voluntary because the trial court (1) did not admonish him about the possibility of consecutive sentencing; (2) allowed him to plead guilty to two counts of first degree murder; and (3) led him to believe that the minimum sentence for first degree murder was 20 or 25 years' imprisonment, when it was actually 45 years. Fourth, he contends that the automatic transfer provision of the Juvenile Court Act is unconstitutional. Fifth, he argues that the mandatory firearm enhancement, in conjunction with mandatory consecutive sentencing statute, as applied to him, violates his rights under the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution.

¶ 48                        A.  Validity of Defendant's Guilty Plea

¶ 49    We first consider whether the trial court erred by denying defendant's motion to vacate his guilty plea. Defendant contends that his plea was not knowing and voluntary because the trial court: (1) failed to admonish him that he was subject to mandatory consecutive sentencing which required that he serve a minimum 57-year sentence; (2) permitted him to plead guilty to two counts of murder when there was only one victim; and (3) admonished him in a manner which caused him to believe that the minimum sentence he faced for first degree murder was 20 or 25 years, when the minimum sentence for first degree murder was in fact 45 years.

¶ 50    The decision to enter a guilty plea is a " 'grave and solemn act.' " *People v. Evans*, 174 Ill. 2d 320, 326 (1996) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). "It is *not* a 'temporary and meaningless formality reversible at the defendant's whim.' " (Emphasis in original.) *Id.* (quoting *United States v. Barker,* 514 F.2d 208, 221 (D.C.Cir.1975)). "A defendant

does not have an absolute right to withdraw his guilty plea \*\*\*." *People v. Manning*, 227 Ill. 2d 403, 412 (2008). Instead, leave to withdraw a guilty plea is only granted when necessary to "correct a manifest injustice under the facts involved" (*People v. Hillenbrand*, 121 Ill. 2d 537, 545 (1988)), or where the plea "was not constitutionally entered" (*Manning*, 227 Ill. 2d at 412). In *Boykin v. Alabama*, the United States Supreme Court held that a court cannot, consistent with due process, accept a guilty plea unless there has been an affirmative showing that the defendant's decision to plead guilty was made " 'intelligently and understandingly.' " 395 U.S. 238, 242 (1969) (quoting *Carnley v. Cochran*, 369 U.S. 506, 516 (1962)); see *People v. Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 17 ("Due process requires that a guilty plea be knowing and voluntary.").

¶ 51    In response to *Boykin*, the Illinois Supreme Court adopted Rule 402. *People v. Whitfield*, 217 Ill. 2d 177, 188 n.3 (2005); see Ill. S. Ct. R. 402 (eff. July 1, 1997). Rule 402 contains several admonishments which a trial court must give to a defendant in open court prior to accepting a guilty plea. The purpose of these admonishments "is to ensure that a defendant understands his plea, the rights he has waived by pleading guilty and the consequences of his action." *People v. Dougherty,* 394 Ill. App. 3d 134, 138 (2009). Under Rule 402(a)(2), a trial court must admonish a defendant about "the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences." Ill. S. Ct. R. 402(a)(2) (eff. July 1, 1997).

¶ 52    Literal compliance with the Rule 402 admonishments is not necessary to satisfy the requirements of due process. *People v. Burt*, 168 Ill. 2d 49, 64 (1995); *Dougherty*, 394 Ill. App. 3d at 138. Instead, "substantial compliance" is sufficient. *Dougherty*, 394 Ill. App. 3d at 138. " 'Substantial compliance' means that although the trial court did not recite to the defendant, and

ask defendant if he understood, all the components of Rule 402(a), the record nevertheless affirmatively and specifically shows that the defendant understood them." *Id.*

¶ 53    Defendant contends that he must prevail if the trial court's admonishments did not substantially comply with Rule 402. Citing *People v. Kidd*, 129 Ill. 2d 432 (1989), defendant argues that "where *** a court fails to substantially comply with Rule 402, a defendant's plea is not knowingly and voluntarily entered and the prejudice is manifest absent such a showing."

¶ 54    Defendant is incorrect. Illinois courts have repeatedly held that a defendant must demonstrate prejudice as a result of an improper Rule 402 admonishment in order to obtain reversal of a trial court order denying a motion to vacate a guilty plea. For example, in *People v. Davis*, decided two years after *Kidd*, the Illinois Supreme Court explained that "[t]he failure to properly admonish a defendant, alone, does not automatically establish grounds for reversing the judgment or vacating the plea. *** Whether reversal is required depends on whether real justice has been denied or whether defendant has been prejudiced by the inadequate admonishment." 145 Ill. 2d 240, 250 (1991); see also *People v. Grant*, 2015 IL App (4th) 140971, ¶ 29 ("[A]n imperfect admonishment does not violate due process where real justice has not been denied or defendant has not shown prejudice."); *People v. Holloway*, 2014 IL App (1st) 131117, ¶ 29 (reversing trial court's denial of motion to vacate guilty plea because defendant was prejudiced by trial court's failure to properly admonish defendant in compliance with Rule 402); *cf. People v. Reid*, 2014 IL App (3d) 130296, ¶ 17 (finding that defendant's waiver of right to pursue appellate and postconviction relief was knowing, intelligent and voluntary where defendant could not show he was prejudiced by inadequate admonishments).

¶ 55    *Kidd* is not to the contrary. In *Kidd*, the defendant pled guilty to several crimes, including multiple counts of first degree murder. 129 Ill. 2d at 434. During a Rule 402

conference, the defendant expressed concern that he would receive a sentence of life in prison without the possibility of parole. *Id.* at 440. In response, the court told defendant " '[t]hat's not necessarily what the sentence may be. That question would be a question for a jury to decide, not for me to make that decision.' " *Id.* The court later told the defendant " 'whether or not a life sentence, that is something that controlled by the statute. I have no control over that.' " *Id.* The defendant agreed to plead guilty and the matter was set for a sentencing hearing during which a jury would decide whether to impose a death sentence. *Id.* at 441. Three days later, the defendant sought to vacate his plea on the basis that he did not understand the court's admonishment regarding the possibility of a life sentence without parole. *Id.*

¶ 56   The Illinois Supreme Court held that the trial court's admonishment was improper because "[n]owhere on the record did the trial court inform defendant, before accepting his pleas, that the court must sentence him, at a minimum, to mandatory natural life imprisonment." *Id.* at 443. The court noted that, although the trial court informed defendant that the maximum penalty he faced was a death sentence, it never informed him that the minimum sentence he faced was life in prison. *Id.* at 443-44. The court concluded that "[b]ecause the trial court did not comply with the requirements of Rule 402, the denial of defendant's motion to withdraw his pleas was an abuse of discretion." *Id.* at 447.

¶ 57   Although the court did not explicitly discuss the prejudice requirement, in the course of distinguishing *People v. Walker*, 109 Ill. 2d 484 (1985), a case which the State principally relied on, the court stated that the defendant in *Walker* "had no expectations that were denied" and emphasized that "[t]he same affirmative showing cannot be made here." *Kidd*, 129 Ill. 2d at 445. By distinguishing *Walker* on the basis that the trial court's admonishments in the case before it

thwarted the defendant's expectations in entering into the plea, the court engaged in a *sub silentio* prejudice analysis.

¶ 58 Thus, in considering whether reversal is required on the basis that the trial court did not properly admonish defendant pursuant to Rule 402, we must consider whether (1) the trial court's admonishment's substantially complied with Rule 402 and (2) if not, whether the defendant suffered prejudice as a result. We review whether the trial court complied with Rule 402 *de novo*. *People v. Chavez*, 2013 IL App (4th) 120259, ¶ 14. We review the trial court's decision to deny defendant's motion to vacate his guilty plea for abuse of discretion. *People v. Delvillar*, 235 Ill. 2d 507, 519 (2009).

¶ 59 We first address whether defendant is entitled to reversal on the basis that the court did not admonish him about consecutive sentencing. Although the record clearly shows that the trial court admonished defendant about the sentencing range for each crime to which he pled guilty, nothing in the trial court's admonishment specifically suggested to defendant the possibility that he was subject to consecutive sentencing. Accordingly, we find that the trial court's admonishments did not substantially comply with Rule 402.

¶ 60 Defendant's argument falters, however, on the prejudice prong of the analysis. Defendant's appellate brief does not explain how he was prejudiced by the trial court's inadequate admonishments. Accordingly, the prejudice issue is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *BAC Home Loans Servicing, LP v. Mitchell,* 2014 IL 116311, ¶ 23.

¶ 61 Forfeiture aside, we would still reject defendant's argument because he cannot show that he suffered prejudice. The Illinois Supreme Court has yet to set forth a clear definition of

prejudice in the Rule 402 context. Nonetheless, several cases from the supreme and appellate court—namely *People v. Anthony Williams*, 2012 IL App (2d) 110559 (*Anthony Williams*), *People v. Torres*, 228 Ill. 2d 382 (2008), *People v. Davis*, 145 Ill. 2d 240 (1991), *People v. Adrian Williams*, 2014 IL App (3d) 120824 (*Adrian Williams*), and *People v. Baker*, 133 Ill. App. 3d 620 (1985)—provide guidance on the issue.

¶ 62    In *People v. Anthony Williams*, the defendant was charged with two counts of retail theft. 2012 IL App (2d) 110559, ¶ 3. The defendant pled guilty to one count of retail theft and was admonished that he was eligible for Treatment Alternatives to Street Crimes (TASC), an alternative sentencing program. *Id.* ¶ 5. In fact, the defendant was not eligible for TASC due to his criminal record. *Id.* ¶ 11 n.1. The court sentenced the defendant to six years and six months in prison. *Id.* ¶ 8. The defendant filed a motion to vacate his plea, arguing that he was prejudiced by the court's admonishment because " '[h]ad [he] known, at the time he entered the plea, that TASC was not a valid sentencing option, he could have more accurately considered the sentencing paradigm and determined his potential sentencing range was great enough that it would be more advantageous to elect to stand trial.' " *Id.* ¶ 11. The trial court denied the motion and the appellate court affirmed. The appellate court explained that in order to show prejudice, the defendant was required to allege that he would not have pled guilty had he been properly admonished. *Id.* ¶ 18 (citing *Davis*, 145 Ill. 2d at 250). The court held that the defendant could not show that he suffered prejudice because he did not allege that he would not have pled guilty had he been properly admonished. *Id.*

¶ 63    In *Torres,* the defendant entered into a blind guilty plea to two counts of first degree murder and was sentenced to 45 years' imprisonment. 228 Ill. 2d at 384. At the plea hearing, the trial court admonished the defendant that the sentencing range for first degree murder was 20

to 60 years' imprisonment. *Id.* at 398. However, the actual minimum sentence the defendant was subject to was 45 years' imprisonment because the mandatory firearm enhancement applied. *Id.* The defendant argued that he should have been permitted to vacate his guilty plea because the trial court did not properly admonish him about the correct minimum sentence he faced.

¶ 64     The Illinois Supreme Court disagreed, reasoning that the trial court "sentenced defendant exactly as he had been admonished." *Id.* at 400. That is, the defendant was advised that he faced 20 to 60 years in prison, and he was sentenced to 45 years' imprisonment, which was within the sentencing range set forth in the court's admonishments. *Id.* at 400-01.

¶ 65     In *Davis*, the defendant was charged with residential burglary and burglary. 145 Ill. 2d at 243. The defendant pled guilty to burglary and the State dismissed the residential burglary charge. The record revealed that the defendant pled guilty on the mistaken belief that he was eligible to participate in TASC, when defendant was in fact ineligible for TASC as well as probation due to his criminal history. *Id.* at 243, 245-49. The court ultimately sentenced the defendant to 10 years' imprisonment. *Id.* at 243.

¶ 66     The defendant filed a motion to withdraw his guilty plea, which the trial court denied. *Id.* The supreme court found that the trial court's admonishments were improper and that the defendant suffered prejudice because he alleged that he would not have pled guilty if he knew he was ineligible for TASC and due to his misapprehension, "he did not attempt to negotiate a lesser term of incarceration, and forwent the opportunity to go to trial, where he may have been acquitted." *Id.* at 250.

¶ 67     In *Adrian Williams*, the defendant was charged with unlawful delivery of a controlled substance. 2014 IL App (3d) 120824, ¶ 3. At a pretrial hearing, the State informed the court that the defendant, due to his criminal history, was eligible for Class X and extended term sentencing.

*Id.* ¶ 4. Accordingly, the court admonished the defendant that he was subject to a sentencing range of 6 to 60 years' imprisonment. *Id.* The defendant subsequently entered into a partially negotiated plea whereby he pled guilty in exchange for a sentencing cap of 25 years. *Id.* ¶ 5. Thereafter, the defendant filed a motion to vacate his plea on the basis that he was erroneously admonished that he faced a maximum 60 year sentence. *Id*. ¶ 6.

¶ 68    The appellate court held that the defendant was improperly admonished because he was not eligible for extended term sentencing. *Id.* ¶ 22. Accordingly, the court found that the maximum sentence defendant faced was 30 years' imprisonment. *Id.* The court held that the defendant was prejudiced by the improper admonishment because he was "under the misapprehension that he was negotiating a 35-year reduction of his maximum possible sentence, not a mere 5 years." *Id.* ¶ 26. The court found that significant because "defendant here lost the opportunity to negotiate a lesser term of incarceration." *Id.*

¶ 69    Finally, in *Baker*, the defendant pled guilty but mentally ill to home invasion, indecent liberties with a child, and attempted deviate sexual assault. 133 Ill. App. 3d at 621. The parties had no negotiations regarding the sentence to be imposed. *Id.* When it admonished the defendant, the court did not tell him that he was subject to consecutive sentencing. The court did, however, inform him that he faced up to 30 years' imprisonment. *Id.* at 622. The court ultimately sentenced the defendant six years' imprisonment for home invasion and four years' imprisonment for indecent liberties with a child and attempted deviate sexual assault. *Id.* at 621. The sentences for indecent liberties with a child and attempted deviate sexual assault were to run concurrent to each other, but consecutive to the sentence for home invasion. *Id.* The defendant subsequently filed a motion to vacate his plea on the basis that the court did not admonish him about the possibility of consecutive sentencing, which the court denied. *Id.* The appellate court

affirmed, reasoning that the defendant could not show that he was prejudiced by the allegedly deficient admonishment because he was informed that he could receive a sentence of up to 30 years' imprisonment, and his aggregate sentence was less than 30 years. *Id.* at 622.

¶ 70    Based on the cases discussed above, we find three reasons why defendant cannot demonstrate that he was prejudiced by the trial court's improper admonishments. First, defendant did not claim anywhere in his motion to vacate or appellate brief that that he would not have pled guilty had he received a proper admonishment. This is fatal to defendant's argument. See *Davis*, 145 Ill. 2d at 250; *Anthony Williams*, 2012 IL App (2d) 110559, ¶ 18 ("Here, defendant does not allege that he would not have pleaded guilty. *** This defeats his claim of prejudice."); see also *People v. Mendoza*, 342 Ill. App. 3d 195, 202 (2003) (finding that defendant could not show prejudice because he did not allege that he would not have pled guilty in face of proper admonishment).

¶ 71    Second, the record establishes that the trial court, when admonishing defendant about the sentencing range he faced as a result of the firearm enhancement, informed defendant that the maximum sentence the court could impose was life in prison. Defendant has presented no argument that the trial court's admonishment in that respect was inaccurate. See *Adrian Williams*, 2014 IL App (3d) 120824, ¶ 26. Thus, the trial court did not impose a sentence on defendant that exceeded the sentence defendant was told he could receive. To the contrary, defendant's sentence was consistent with the court's admonishment that he could receive up to a life sentence as a result of the firearm enhancement. See *Torres*, 228 Ill. 2d at 400. Because defendant's sentence was consistent with at least one of the sentencing parameters of which he was admonished, he cannot show that he suffered prejudice. *Id.* at 400-01; see also *Baker*, 133 Ill. App. 3d at 622.

¶ 72   Third, defendant entered into a blind plea.  Defendant was admonished that there was no agreement between him and the State or court regarding the sentence he would receive.  Thus, defendant had no reasonable expectations regarding the sentence he would receive.  Therefore, he cannot argue that his expectations were thwarted or that he would have negotiated a more favorable plea had he received a proper admonishment.  See *Adrian Williams*, 2014 Il App (3d) 120824, ¶ 26; see also *Kidd*, 129 Ill. 2d at 445.

¶ 73   We next consider whether reversal is required because the trial court permitted defendant to plead guilty to two counts of first degree murder or because it failed to admonish defendant of the correct minimum sentence he faced for first degree murder.  Defendant did not raise either of these arguments in his motion to vacate.  Accordingly, defendant has forfeited these arguments.  See Ill. S. Ct. R. 604(d) (eff. Dec. 11, 2014).  Defendant argues that we may nevertheless consider these claims, either as plain error or ineffective assistance of counsel.  We consider these arguments in turn.

¶ 74   Under the plain error doctrine, "we may review plain errors affecting substantial rights, though not objected to at trial or in a post-trial motion."  *People v. Fuller*, 205 Ill. 2d 308, 343 (2002); see Ill. S. Ct. R. 615(a).  We may review claims under the plain-error doctrine when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."  *People v. Piatkowski,* 225 Ill. 2d 551, 565 (2007).

¶ 75   The second prong of the plain error doctrine has been equated with structural error.  *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010).  "Structural error is a systemic error that

36

erodes the integrity of the judicial process" and which so undermines the fairness of the underlying proceeding as to necessitate automatic reversal. *People v. Downs*, 2014 IL App (2d) 121156, ¶ 31. Structural error has only been recognized in a narrow subset of cases, namely those involving the complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, denial of a public trial, and where the trial court propounds a defective reasonable doubt instruction. *Id.*

¶ 76    Defendant's plain error arguments consists entirely as follows:

> "However, this Court can reach the merits of this issue as plain
>
> error because a court's failure to admonish a defendant pursuant to
>
> Rule 402 affects substantial rights. ILL. SUP. CT. R. 615(a)
>
> (2008); *see also People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007);
>
> *People v. Waldorf*, 94 Ill. App. 3d 976, 981 (1st. Dist. 1981)
>
> (applying plain error test to issue of trial court's compliance with
>
> Rule 402)."

In *People v. Nieves*, the Illinois Supreme Court held that the defendant's plain error argument was waived because it consisted of a single sentence and "neither argue[d] that the evidence was closely balanced nor explain[ed] why the error [was] so severe that it must be remedied to preserve the integrity of the judicial process." 192 Ill. 2d 487, 503 (2000). We find that defendant has similarly waived his plain error argument here. Defendant does not argue that the evidence in the case is closely balanced, and *People v. Waldorf*, 94 Ill. App. 3d 976 (1981), did not hold that an improper Rule 402 admonishment constitutes structural error. Accordingly, we find that defendant has forfeited his plain error argument.

¶ 77    Alternatively, defendant contends that his lawyer rendered ineffective assistance by failing to raise these issues in the motion to vacate his guilty plea.  Ineffective assistance of counsel claims are governed by standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail on such a claim, a criminal defendant must show that trial counsel's performance was objectively deficient and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694; *People v. Stewart*, 141 Ill. 2d 107, 118 (1990).

¶ 78    Reaching the merits of defendant's remaining arguments under the deficiency prong of *Strickland*, we find that defendant's ineffective assistance of counsel claim fails because, even assuming that the trial court's admonishments were improper, defendant cannot show that he suffered prejudice.[1]  With regard to his claim that the trial court permitted him to plead guilty two counts of first degree murder, we note that defendant has failed to articulate how he was prejudiced or allege that he would not have pled guilty had the court admonished him differently.  In light of this failure, we cannot find that defendant's counsel was constitutionally deficient for not raising this issue before the trial court.

¶ 79    Nor did defendant's counsel render ineffective assistance by failing to argue that the trial court's failure to advise defendant of the correct minimum sentence for first degree murder rendered his plea involuntary.  Because defendant was admonished that he faced up to life in prison in and his sentence was consistent with that admonishment, defendant cannot show that he suffered prejudice.  And, because defendant's underlying argument lacks merit, his counsel was not ineffective for failing to raise it in the motion to vacate.  See *People v. Griffin*, 148 Ill. 2d 45, 57 (1992) (attorney's failure to challenge voluntariness of post-arrest statement not ineffective

---

[1]We refer to "prejudice" as that term is used in the context of a Rule 402 analysis and not the second prong of a *Strickland* claim.

assistance because argument would have been futile); *People v. Rucker*, 346 Ill. App. 3d 873, 889 (2003) (attorney's failure to file motion to suppress not ineffective assistance because motion would have been futile).

¶ 80    In sum, we find that the trial court did not abuse its discretion by denying defendant's motion to vacate his guilty plea.

¶ 81                              B.  Validity of Defendant's Sentence

¶ 82    We next consider whether the trial court erred by denying defendant's motion to reconsider his sentence.  Defendant specifically argues that the court committed error during the sentencing hearing by (1) basing its sentencing decision on its personal beliefs and private investigations; (2) abandoning its role as neutral arbiter; (3) punishing him for declining to speak in allocution; and (4) failing to consider mitigating evidence.

¶ 83    A trial court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).  We must give "substantial deference" to the trial court's sentencing decision "because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36.  Accordingly, we will not disturb the trial court's sentencing decision absent an abuse of discretion.  *Id.*

¶ 84            *1. Whether the Trial Judge Abandoned His Role as Neutral Arbiter*

¶ 85    We first consider defendant's contention that the trial judge abandoned his role as neutral arbiter by examining Dr. Hanlon during the sentencing hearing.  "[A] trial judge has the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure." *People v. Palmer*, 27 Ill. 2d 311, 314 (1963); see Ill. R. Evid. 614(b) (eff. Jan. 1,

2011). Whether such an examination was proper is determined on a case-by-case basis and rests largely in the court's discretion. *Palmer*, 27 Ill. 2d at 315.

¶ 86    In arguing that the trial court's conduct was improper, defendant relies principally upon *People v. Jackson*, 409 Ill. App. 3d 631 (2011). In *Jackson*, the appellate court held that the trial judge abandoned his role as neutral arbiter "by adopting a prosecutorial role when questioning defendant's expert witness." *Id.* at 647. Several pertinent factors affected the court's analysis. First, the court noted that the "tone and manner" of questions interposed by the court to the defendant's expert "exhibit[ed] bias that is more similar to a cross-examining prosecutor than an impartial jurist." *Id.* at 648. The court stated that the court's questions were "argumentative and showed a disregard and unfavorable bias." *Id.* As an example, the court cited a colloquy during which the court trapped the defense's expert witness by asking the witness about medications the defendant was taking and then impeaching him by pointing out that he was not a physician and thus was not qualified to testify about the effects of medications because he could not prescribe medications. *Id.* at 636, 648. The court also pointed out that the trial judge asked the witness who had hired him, which could have only served to expose the witness's possible bias in favor of the defendant. *Id.* at 648. As additional evidence that the trial judge was biased against the defendant, the appellate court noted that the trial judge repeatedly referred to the defendant's shooting as a " 'murder,' " despite the fact that the trial had not ended. *Id.* at 649.

¶ 87    We find, for several reasons, that *Jackson* is distinguishable from the present case. First, we see no evidence in the record that the trial court prejudged the outcome of the case. To the contrary, by asking Dr. Hanlon whether defendant's gang membership contradicted testimony that defendant's disability would hinder his ability to socialize, the judge gave Dr. Hanlon an opportunity to clarify his testimony. Rather than show bias, this demonstrates open-mindedness.

Similarly, there is no evidence that the court attempted to trap Dr. Hanlon by inviting him to testify about matters outside his area of expertise. Rather, the court's questions were focused precisely on the testimony Dr. Hanlon had only moments before given in response to questions by the State and defense counsel. And importantly, the court did not ask Dr. Hanlon questions designed exclusively to expose bias in favor of defendant.

¶ 88    It is true that the court repeatedly used leading questions when examining Dr. Hanlon. Defendant suggests that such questions were "by definition *** not open minded." But when considering whether the trial court exceeded its authority in questioning a witness, we are not bound down by *per se* rules, such as the absolute rule against leading questions defendant urges us to adopt. Instead, our consideration of "[w]hether a trial court's questioning of a witness is appropriate depends on the facts and circumstances of each case and rests largely in the discretion of the trial court." *Id.* at 647; see *People v. Smith*, 299 Ill. App. 3d 1056, 1062 (1998) ("It is not *per se* error for a trial judge to question a witness."). Considered under the totality of the circumstances, we do not believe that the trial court's use of leading questions was improper.

¶ 89    Nor do we believe that reversal is necessary because the court's questions elicited testimony favorable to the State. Certain facts contained in defendant's presentence report could have been viewed as contradicting Dr. Hanlon's testimony that defendant had difficulty socializing. Specifically, the report indicated that defendant had a good relationship with his mother, that he was on numerous school athletic teams from sixth through ninth grade, and that he participated in music and a school play during the eighth grade. The report further indicated that defendant enjoyed spending his free time "going to the center," where he would spend his time doing homework, playing basketball, and "be up under a girl and chill." The nature of these activities suggests that defendant possessed at least a modicum of social skills, and thus

41

superficially undercut Dr. Hanlon's testimony. Under these circumstances, it was not improper for the trial judge to examine Dr. Hanlon to better understand his testimony, even if the resulting colloquy produced testimony unfavorable to defendant. See *People v. Sutton*, 260 Ill. App. 3d 949, 959-60 (1994) ("The trial court does not *** assume the role of prosecutor merely because its questions solicit evidence material to the State's case."). Based on the foregoing, we find that the trial court did not abandon its role as neutral arbiter.

¶ 90        *2. Whether the Trial Court Failed to Consider Mitigating Evidence*

¶ 91    We next consider whether the trial court committed error by failing to consider mitigating evidence. Under the proportionate penalties clause of the Illinois Constitution, a trial court must fix a defendant's punishment "according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. " 'This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment.' " *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010) (quoting *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002)). That balancing, in turn, requires that the court engage in an inclusive, holistic consideration of "all of the factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *Id.* In accordance with these principles, a " 'sentencing authority may not refuse to consider relevant evidence presented in mitigation.' " *Id.* at 386 (quoting *People v. Heinz*, 391 Ill. App. 3d 854, 865 (2009)).

¶ 92    Though sentencing courts may not disregard mitigating evidence, they retain discretion to assign how much weight it carries. *People v. Markiewicz*, 246 Ill. App. 3d 31, 55 (1993).

Accordingly, "the existence of mitigating factors does not automatically oblige the trial court to reduce a sentence from the maximum allowed." *Id.* Moreover, when the defendant has presented mitigating evidence to the court, it is presumed that the court considered the evidence. *Id.*; see also *People v. Willis*, 210 Ill. App. 3d 379, 389 (1991); *People v. Baker*, 114 Ill. App. 3d 803, 811 (1983). The presumption that the trial court considered all mitigating evidence may be rebutted, but to do so the defendant must point to evidence other than the sentence which the court imposed. *Markiewicz*, 246 Ill. App. 3d at 55. In other words, a harsh sentence, standing alone, does not show that the court ignored mitigating evidence.

¶ 93    In the present case, defendant argues that, given the length of his sentence (he will be 110 years old when he is released), "[the trial judge's] insistence that he considered [defendant's] upbringing rings hollow." We reject defendant's argument because, as we explained above, a defendant cannot rebut the presumption that the court considered mitigating evidence by merely pointing to the harshness of the sentence imposed by the court.

¶ 94    Moreover, defendant's contentions are affirmatively rebutted by the record. When the court began announcing its sentence, it prefaced its remarks by explaining that it would base defendant's sentence on "the facts of the case," the PSI, the victim impact statements, and the evidence and arguments in aggravation and mitigation. In his brief, defendant specifically argues that the court failed to consider the following mitigating factors: his (1) youth; (2) rehabilitative potential; (3) upbringing; (4) history of substance abuse; (5) disability; and (6) lack of a criminal record. However, evidence regarding each of these factors was presented to the court, either through argument by defense counsel or through the presentence report. In light of the court's prefatory comments and the fact that record establishes

43

that the evidence highlighted by defendant was presented to the court, we find that the record conclusively establishes that the court considered all mitigating evidence presented by defendant.

¶ 95    Defendant also argues that the court's statement that defendant's sentence "serves two masters.  One, that it is retributive, and two, that it is a message to those people in those dark alleys *** that people like you and I outnumber them by thousands and by millions" shows that the court did not consider his rehabilitative potential.  This argument, however, ignores the judge's statement that he would consider the mitigating evidence presented by defendant.  Mitigating evidence is itself evidence of rehabilitative potential; thus, the court's statement that it would consider evidence in mitigation was an implicit statement that it would consider defendant's rehabilitative potential.  See *People v. Gaines*, 88 Ill. 2d 342, 381-82 (1981) (statutory requirement that death penalty jury consider any relevant mitigating factors sufficient to satisfy constitutional muster under proportionate penalties clause); *People v. Parker*, 192 Ill. App. 3d 779, 791 (1989) (trial court's consideration of presentence report and attorney's argument reciting mitigating factors sufficient to show that court took defendant's rehabilitative potential in account); see also *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992) ("[T]he trial court is not required to *** make an express finding that the defendant lacked rehabilitative potential [citation].").  Understood in this light, the court's failure to state that the sentence furthered the purpose of rehabilitating defendant makes sense: if the court believed that defendant lacked rehabilitative potential, then there was no reason for the court to announce that defendant's sentence furthered the purpose of rehabilitating him.  Accordingly, we find that the court did not abuse its discretion by failing to consider mitigating evidence.

¶ 96    *3. Whether the Trial Court Violated Defendant's Privilege Against Self-Incrimination*

¶ 97    We next consider whether the trial court committed reversible error by punishing defendant for declining to speak in allocution. During the sentencing hearing, the trial court stated that it would consider "the defendant's right of allocution, which he did not avail himself of." Defendant, citing *Mitchell v. United States*, 526 U.S. 314 (1999) and *People v. Swank*, 344 Ill. App. 3d 738 (2003), contends that the trial court punished him for exercising his right to silence by (1) drawing from his silence the negative inference that he lacked remorse and (2) considering his purported lack of remorse as an aggravating factor.

¶ 98    The privilege against self-incrimination emanates from the self-incrimination clause of the fifth amendment to the United States Constitution, which provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. The privilege, applicable to the states through the fourteenth amendment, (*Malloy v. Hogan*, 378 U.S. 1, 8 (1964)), was enacted as a repudiation of the practices of the Star Chamber and ecclesiastical courts of England (*Andresen v. Maryland*, 427 U.S. 463, 470 (1976); *Ullmann v. United States*, 350 U.S. 422, 428 (1956)), which followed "the inquisitorial method of putting the accused upon his oath and compelling him to answer questions designed to uncover uncharged offenses, without evidence from another source" (*Doe v. United States*, 487 U.S. 201, 212 (1988)). The essence of the privilege is " 'the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips.' " (Emphasis in original.) *Estelle v. Smith*, 451 U.S. 454, 462 (1981) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 581-82 (1961)). "[T]he privilege is fulfilled only when a criminal defendant is guaranteed the right 'to

remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty *** for such silence.' " *Id.* at 468 (quoting *Malloy*, 378 U.S. at 8).

¶ 99    Accordingly, "[t]he normal rule in a criminal case is that no negative inference from the defendant's failure to testify is permitted." *Mitchell*, 526 U.S. at 327-28; see *Griffin v. California*, 380 U.S. 609, 615 (1965) (holding that fifth amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt"). The privilege applies in noncapital sentencing hearings. *Mitchell*, 526 U.S. at 326-27. Moreover, a criminal defendant does not waive the privilege by entering a guilty plea. *Id.* at 316.

¶ 100    Applying these principles, we hold that a criminal defendant's privilege against self-incrimination is unconstitutionally infringed when (1) the defendant's silence is used as evidence that he lacks remorse and (2) the trial court considers the defendant's lack of remorse as an aggravating factor when imposing a sentence. A contrary rule would require criminal defendants to choose between (1) waiving their right to silence and speaking in allocution to express remorse (perhaps untruthfully) on the one hand, and (2) maintaining steadfast in their silence and thereby risking a lengthier sentence, on the other. Such an interpretation of the fifth amendment would be self-defeating, for as we have explained above, that text at its core means that the government, not the accused, must produce the evidence necessary to convict and impose a particular punishment. *Estelle*, 451 U.S. at 462. Thus, while a sentencing court may consider a defendant's lack of remorse as an aggravating factor, evidence that the defendant lacks remorse must be drawn from some source other than the defendant's silence during the sentencing hearing, such as the manner in which the defendant refers to a victim (see *People v. Burgess*, 176 Ill. 2d 289, 317 (1997)) or describes his crime (see *People v. Neal*, 111 Ill. 2d 180, 196 (1985)).

¶ 101   During the hearing on defendant's motion to reconsider sentence, the trial court attempted to walk back its statement that it would consider defendant's declination to speak in allocution, stating that it "really didn't even play a role in my sentencing."  That statement is not sufficient to assuage our concerns, for as the court has previously explained, "[i]f it is on [the judge's] tongue, it most assuredly must be on his mind."  *People v. Wardell*, 230 Ill. App. 3d 1093, 1103 (1992).  In light of the trial court's unequivocal statement during the sentencing hearing that it would consider "the defendant's right of allocution, which he did not avail himself of," we find that record affirmatively shows that defendant was punished for choosing to remain silent during the sentencing hearing.  Accordingly, we vacate defendant's sentence and remand for resentencing.

¶ 102   *4. Whether the Trial Court Considered Improper Evidence at the Sentencing Hearing*

¶ 103   We next consider whether the trial court considered its personal beliefs about gang violence and private investigations during the sentencing hearing.  It is presumed that trial judges consider only competent evidence and discard incompetent evidence when rendering decisions.  *People v. Robinson*, 30 Ill. 2d 437, 439 (1964); see *People v. Naylor*, 229 Ill. 2d 584, 603 (2008).  This presumption may be rebutted, however, when the record " 'affirmatively shows' " that the court considered improper evidence.  *Naylor*, 229 Ill. 2d at 603-04 (quoting *People v. Gilbert,* 68 Ill. 2d 252, 258-59 (1977)).  "Consideration of an improper factor in aggravation affects a defendant's fundamental right to liberty, and therefore, is an abuse of discretion."  *People v. McAfee,* 332 Ill. App. 3d 1091, 1096 (2002).  The underlying question of whether the court in fact considered an improper factor presents a legal question which we review *de novo*.  *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 104   The record from defendant's sentencing hearing reveals that the trial court considered its personal feelings about gang violence as well as evidence that was not presented by either party. For example, immediately after discussing the sentencing factors the court would consider, the court noted that it was "saddened" and that it would "bring to bear" its "personal experience" of the effects of gang violence when sentencing defendant.  Later, the trial judge discussed walking his daughter to school and then hypothesized about the feelings of other parents who take their children to school, stating "I know that on the date that Blair Holt was killed, his parents kissed him good-bye and told him they loved him."  The court also indicated that he was aligned with the victims' families, declaring "[t]he Holts, their son, the other children on that bus, they define who I am."  The court then stated "[n]o amount of guns and no amount of young punks and no amount of gang members are ever going to find enough dark corners and dark alleys to hide in, because there are way, way more of *us* than there are of them." (Emphasis added.).  Referring to the surveillance video of the shooting, the judge again referred to his daughter, stating "I *** watched the man before me mount the steps to that bus, buses that I have mounted my whole life, buses that I have mounted with my daughter ***."

¶ 105   Later, the court referred to the "fact" that "only one or two percent of the population make the lives of those there miserable by their conduct," despite the fact that no evidence supporting that statement had been introduced by either party.  Later, when discussing Dr. Hanlon's testimony, the court declared that children from Deerfield also face challenges similar to those faced by defendant but have not committed transgressions like defendant's.  As with the 2 % comment, this statement was not corroborated by any evidence introduced by either party. The court's consideration of these evidentiary matters which were not supported by the evidence

was improper. See *People v. Dameron*, 196 Ill. 2d 156, 179 (2001); *People v. Rivers*, 410 Ill. 410, 418-19 (1951).

¶ 106 Furthermore, when discussing Dr. Hanlon's testimony, the trial court noted that it had "heard from doctors like Hanlon before" and referred to its "experience with their testimony." Later, the court stated that it was "weary tired of watching doctors, psychologists, walk into my courtroom and somehow provide some shade for the conduct of a person like Michael Pace." These statements show the trial judge, in rejecting Dr. Hanlon's testimony, considered matters outside the record. This, too, was improper and constitutes prejudicial error. See *People v. Steidl*, 177 Ill. 2d 239, 266 (1997) (in postconviction hearing, trial judge's consideration of prior knowledge of attorney's performance in past cases improper; consideration of such evidence is prejudicial error); *Jackson*, 409 Ill. App. 3d at 650 (holding that trial judge considered evidence outside record where the court stated " '[m]ental acuity is constantly misrepresented in the circumstances of the testimony that I hear from the witness stand in this building.' ").

¶ 107 We note again that the trial court began its comments by stating that its sentencing decision would be based on several valid considerations, such as the mitigating and aggravating evidence and the facts of the case. The State suggests that the court's decision was based *solely* on those factors. But as we have explained, the record does not permit such a finding. The trial court's extensive remarks about the problem of gang violence in Chicago, as well as its discussions of its personal views and experiences and consideration of evidence not located in the record, show that the judge considered much more than just the facts of the case and the mitigating and aggravating factors. See *Wardell*, 230 Ill. App. 3d at 1103.

¶ 108 As a result of these errors, defendant was denied a fair sentencing hearing. Consequently, we must vacate defendant's sentence and remand for resentencing. We do not

reach this conclusion lightly. "[W]here it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required." *People v. Bourke*, 96 Ill. 2d 327, 332 (1983). The facts of this case would wrench the emotions of even the most staid jurist, and we appreciate and understand the sentiments which the able and experienced trial judge expressed during sentencing. However, based on the record before us, we cannot conclude that the trial court placed insignificant weight on the improper considerations we have described above. Indeed, the record suggests that the trial court placed significant emphasis on these considerations. It is noteworthy that the portion of the record in which the trial court announced its sentence goes on for 16 pages. At least four of those pages were devoted solely to the court discussing its personal feelings about gang violence; other large portions see the judge discussing the victims and stating that that he was aligned with them. Under these circumstances, we must vacate the defendant's sentence and remand the case for resentencing. In light of the issues described above, the defendant's resentencing must be before a different judge. See *People v. Negrete*, 258 Ill. App. 3d 27, 32 (1994).

¶ 109    C.  Whether the Trial Court Remained Neutral During the Hearing on Defendant's
Motion to Vacate Guilty Plea

¶ 110    We next consider whether the trial judge abandoned its role as neutral arbiter during the hearing on defendant's motion to vacate his guilty plea by assuming the role of the prosecutor and improperly examining Dr. Grossman. We begin, however, with the issue of forfeiture. The State contends that defendant forfeited this issue by failing to object during the hearing and raise the issue in a post-hearing motion. Generally, the failure to contemporaneously object and raise an issue in a posthearing motion results in the issue's forfeiture on review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, "[a]pplication of the waiver rule *** is less rigid where

the basis for the objection is the circuit judge's conduct." *People v. Davis*, 185 Ill. 2d 317, 343 (1998). We will therefore review the issue for error.

¶ 111 Defendant first complains that the trial judge rejected Dr. Grossman's testimony because Dr. Grossman testified in response to one of the court's questions that she did not ask whether defense counsel prepared defendant to receive his admonishments in advance of the guilty plea hearing. Defendant contends that this fact was irrelevant to the purpose of the hearing because the issue was whether defendant had the mental capacity to understand his admonishments. Defendant concludes by citing *People v. Weakley*, 45 Ill. 2d 549 (1970), for the proposition that "a plea's voluntariness depends upon the trial court's admonitions to the defendant in open court, not what counsel informed the defendant prior to the proceedings."

¶ 112 Defendant's reliance on *Weakley* is misplaced. In *Weakley*, the trial court failed to admonish the defendant about the maximum penalty he was facing. *Id.* at 552. The Illinois Supreme Court held that Illinois law requires that the court admonish the defendant about the maximum penalty possible, and that the court's failure to do so could not be excused even when there was evidence that trial counsel explained to the defendant the maximum penalties he was facing. *Id.* at 552-53. *Weakley* thus had nothing to do with the defendant's capacity to understand an admonishment.

¶ 113 "To enter a voluntary plea of guilty, a defendant must understand the nature of the proceedings against him and be competent to assist in his own defense." *People v. Shanklin*, 351 Ill. App. 3d 303, 306 (2004); *People v. Perkins*, 53 Ill. App. 3d 412, 415 (1977). It seems to us beyond dispute that evidence showing whether trial counsel conferred with defendant prior to the guilty plea hearing to explain to him the admonishments he would receive is directly relevant to the issue of whether defendant understood the trial court's admonishments. Although such a

conference is not required in every case, whether such discussions took place is probative of whether the defendant has the necessary mental capacity to enter a guilty plea. See *People v. Palmer*, 27 Ill. 2d 311, 313 (1963) (finding that defendant validly waived right to jury trial where defendant stated in open court that he did not understand admonishments in open court but record reflected that defense counsel had explained admonishments to defendant). Accordingly, we disagree with defendant and find that the trial court did not abuse its discretion by asking Dr. Grossman about the extent of defense counsel's preplea discussions with defendant.

¶ 114 Defendant next contends that the trial judge exhibited bias because he asked Dr. Grossman leading questions. However, as we have explained, the mere fact that the trial court asked leading questions does automatically mean the judge was biased.

¶ 115 Defendant also argues that the judge's bias was evident based on the fact that he repeatedly interrupted Dr. Grossman and "belittled" her by stating that one of his questions was "simple." We disagree. When considered in context, it is clear that the trial court did not intend to insult Dr. Grossman, but rather sought to clarify its question. Towards the end of the Dr. Grossman's redirect examination, she testified that defendant would have an easier time understanding material if he had the opportunity to read it as opposed to only hearing it. The court then asked Dr. Grossman whether that "[w]ouldn't that be the case for everybody?" Dr. Grossman initially answered in the negative. After the court attempted to restate its question, Dr. Grossman answered "[t]hat's not what I'm hearing here." At that point, the court stated "[t]hat's the question is asked you, though, and it's a pretty simple one." Dr. Grossman then answered "yes." The fact that Dr. Grossman changed her answer shows that the court's question needed clarification and is therefore evidence that the purpose of the court's statements was not to belittle Dr. Grossman, but rather clarify his question.

¶ 116    Defendant also takes issue with the court's questioning of Dr. Grossman regarding whether she previously offered expert testimony based on reports prepared by other people. Defendant argues that, because the State had stipulated to Dr. Grossman's expertise, this question could only serve to undermine her testimony.  We disagree.

¶ 117    It is widely accepted that "[a]n expert's opinion is only as valid as the basis and reason for the opinion."  (Internal quotation marks omitted.)  *People v. Jones*, 2015 IL App (1st) 121016, ¶ 94 (quoting *People v. Wright*, 2012 IL App (1st) 073106, ¶ 127).  In the present case, it is clear from the content of the court's question that the judge was interested in confirming that Dr. Grossman had an adequate basis for her opinion that defendant lacked the capacity to understand his admonishments.  Thus, this line of questioning was not improper.

¶ 118    Based on the foregoing, we find that the trial judge did not abandon his role as neutral arbiter during the hearing on defendant's motion to vacate his guilty plea.

¶ 119    D.  Whether the Automatic Transfer Statute, the Firearm Enhancement, and Consecutive Sentencing Statute Are Constitutional

¶ 120    We next consider defendant's constitutional challenges to the automatic transfer statute, consecutive sentencing statute, and the mandatory firearm enhancement.[2]  Defendant's arguments are two-fold.  First, he argues that the automatic transfer provision of the Juvenile Court Act of 1987 violates his right to due process under the Illinois and United States constitutions, as well as the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution.  Second, he argues that the mandatory firearm enhancement and consecutive sentencing statute, as applied to him in conjunction with one another, violate his rights under the eighth amendment and proportionate penalties clause.

---

[2]These issues are not moot, despite the fact we are vacating defendant's sentence, because on remand these statutes will still be applicable to defendant.

¶ 121         *1. Whether the Automatic Transfer Provision is Constitutional*

¶ 122   We first consider defendant's challenge to the automatic transfer provision of the

Juvenile Court Act.  See 705 ILCS 405/5-130 (West 2006).  The automatic transfer statute

mandates that minor offenders charged with certain enumerated offenses, including first degree

murder and aggravated battery with a firearm, have their cases heard in adult criminal court.  705

ILCS 405/5-130(1)(a) (West 2006).  Defendant contends that the automatic transfer statute

violates the due process clause of the fourteenth amendment "because it is not rational to transfer

15- and 16-year-old offenders to adult court without a hearing where none of the four legitimate

penological justifications for adult sentencing practices apply to juvenile offenders."  Defendant

further argues that the statute violates the eighth amendment and proportionate penalties clause

because the mandatory nature of the statute precludes courts from considering  an offender's

youth and other characteristics before transferring a case to adult court.

¶ 123   The Illinois Supreme Court rejected virtually identical arguments in *People v. Patterson*,

2014 IL 115102, ¶¶ 93-98 (rejecting due process challenge), ¶ 101 (rejecting eighth amendment

and proportionate penalties clause challenges).  *Patterson* is binding authority on us, so we must

reject defendant's challenge to the constitutionality of the automatic transfer statute.

¶ 124   *2. Whether the Mandatory Firearm Enhancement and Mandatory Consecutive*
                *Sentencing Statutes Are Constitutional*

¶ 125   We next consider defendant's constitutional challenges to the mandatory firearm

enhancement and consecutive sentencing statute.  The firearm enhancement is contained in

section 5-8-1 of the Unified Code of Corrections, which provides in relevant part "if, during the

commission of the offense, the person personally discharged a firearm that proximately caused

*** death to another person, 25 years or up to a term of natural life shall be added to the term of

imprisonment imposed by the court."  730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006).  The

consecutive sentencing statute is contained in section 5-8-4 of the Unified Code of Corrections, which provides in relevant part that the trial court must impose consecutive sentences if "one of the offenses for which defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4 (West 2006). Pursuant to this statute, defendant was subject to mandatory consecutive sentencing because first degree murder and aggravated battery with a firearm are both triggering offenses. 720 ILCS 5/12-4.2(b) (West 2006) (aggravated battery with a firearm is a Class X offense).

¶ 126                            *i*. *Constitutionality Under Eighth Amendment*

¶ 127   The eighth amendment, applicable to the states through the fourteenth amendment, (*Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008)), provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." (U.S. Const., amend. VIII). The United States Supreme Court has interpreted the cruel and unusual punishment clause to prohibit "inherently barbaric punishments" as well as punishments which are disproportionate to the offense. *Graham v. Florida*, 560 U.S. 48, 59 (2010).

¶ 128   Within the past ten years, the United States Supreme Court has decided three eighth amendment cases addressing juvenile sentencing issues. The first case was *Roper v. Simmons*, 543 U.S. 551 (2005). In *Roper*, the Court held that the eighth amendment prohibited the imposition of a death sentence on juvenile homicide offenders. *Id.* at 578. The Court explained that three key distinctions between juvenile and adult offenders "demonstrate[d] that juvenile offenders cannot with reliability be classified among the worst offenders." *Id.* at 569. First, the Court noted that juveniles are often immature and lack a sense of responsibility. *Id.* Second, the Court emphasized that juveniles are often more susceptible to peer pressure and other negative influences. *Id.* Finally, the Court pointed out that, unlike an adult offender, a juvenile's

character is "less fixed." *Id.* at 570. As a result of these differences, the Court explained, juvenile offenders have less moral culpability than their adult counterparts, and therefore the penological justifications for imposing the death penalty—retribution and deterrence—are substantially diminished in cases involving juveniles. *Id.* at 571.

¶ 129   Next came *Graham*. In *Graham*, the Court held that the eighth amendment prohibited the imposition of life without parole sentences for juveniles convicted of nonhomicide offenses. 560 U.S. at 52. In explaining its decision, the Court noted that juveniles have reduced culpability due to their youth and are therefore "less deserving of the most severe punishments." *Id.* at 68. The Court further noted that a life sentence without parole is the second most severe penalty a court could impose and that the penalty is more severe for juveniles because they will serve a greater portion of their lives in prison than similarly situated adult offenders. *Id.* at 70.

¶ 130   Most recently, in *Miller v. Alabama*, 567 U.S. at ___, 132 S. Ct. 2455 (2012), the Court held that the eighth amendment prohibited the imposition of statutorily mandated sentences of life imprisonment without parole for juveniles convicted of homicide. *Id*. at ___, 132 S. Ct. at 2469. The Court explained that the constitutional defect of such statutes was that they divested courts of any discretion to take into account a juvenile defendant's youth and other traits during sentencing. *Id*. at ___, 132 S. Ct. at 2466.

¶ 131   Defendant argues that the firearm enhancement and consecutive sentencing statute are unconstitutional as applied to him for two reasons. First, he contends that the 57-year minimum sentence the court was required to impose was a *de facto* life sentence and therefore violated *Miller*. While this argument has some facial appeal, the current state of the law in Illinois does not support it. In *People v. Gay*, 2011 IL App (4th) 100009, the defendant, a mentally ill man, was sentenced to a 97-year aggregate prison term. *Id.* ¶ 20. On appeal, the defendant argued that

his 97-year aggregate sentence violated the eighth amendment because it was a *de facto* life sentence. The appellate court disagreed, explaining that the defendant's aggregate prison term was different from a sentence of life without parole because a life sentence is "[n]ot an accumulation of sentences," but rather "is tied to a single conviction and is absolute in its duration for the offender's natural life." *Id.* ¶ 23; see also *People v. Reyes*, 2015 IL App (2d) 120471, ¶ 23; *People v. Cavazos*, 2015 IL App (2d) 120171, ¶ 99; but see *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 61 (declining to follow *Reyes* and *Cavazos*).

¶ 132    Defendant's second argument is that these statutes encroach on the trial court's discretion to impose any sentence it wants and so violate *Miller*. Here, defendant notes that *Miller* struck down a mandatory sentencing statute. *Miller*, however, merely stands for the proposition that the state cannot impose adult mandatory *maximum* penalties on a juvenile offender without permitting the sentencing authority to take the defendant's youth and other attendant characteristics into consideration. See *Cavazos*, 2015 IL App (2d) 120171, ¶ 98 (noting that *Miller* only stands for proposition that " 'a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles' " (emphasis omitted) (quoting *Miller*, 567 U.S. at ____, 132 S. Ct. at 2475)); see also *Reyes*, 2015 IL App (2d) 120471, ¶ 11 ("*Miller* did not preclude a sentence of life without parole for homicide offenders; it required only that the trial court first consider the special characteristics of young offenders, such as immaturity, impetuosity, and the failure to appreciate risks and consequences, before imposing such a sentence on a juvenile defendant."); *People v. Pacheco*, 2013 IL App (4th) 110409, ¶ 58 ("The Supreme Court did not hold in *Roper*, *Graham*, or *Miller* the eighth amendment prohibits a juvenile defendant from being subject to the same mandatory

minimum sentence as an adult, unless the mandatory minimum sentence was death or life in prison without the possibility of parole.").

¶ 133   In *People v. Banks*, 2015 IL App (1st) 130985, a division of this court rejected arguments similar to those made by defendant in the present case.  As in this case, the defendant in *Banks* was a juvenile convicted of first degree murder.  *Id.* ¶ 2.  And like defendant in this case, the defendant in *Banks* argued that the application of the firearm enhancement statute to him was unconstitutional under the *Roper*/*Graham*/*Miller* trilogy because it resulted in a mandatory minimum sentence of 45 years' imprisonment.  *Id.* ¶ 18.  The court rejected this argument, explaining:

> "Unlike those cases, which involved the imposition of the death penalty (*Roper*) and a mandatory life sentence without the possibility of parole (*Graham* and *Miller*) without allowing the trial court any discretion in sentencing, the trial court in the instant case was able to consider defendant's age and culpability in sentencing defendant. The trial court had the discretion to impose a sentence between 45 and 85 years." *Id.* ¶ 19.

¶ 134   Until the Illinois or United States Supreme Court rules otherwise, we believe the best course is to follow this line of cases as outlined above.  Here, defendant was not subjected to a sentencing scheme which mandated a sentence of life in prison without parole.  More importantly, consistent with *Miller's* requirement that a sentencing authority retain some discretion to consider a juvenile's youth before imposing a severe sentence, the trial judge in this case had discretion to impose a sentence between 57 years and life imprisonment.  See *Miller*, 567 U.S. at __, 132 S. Ct. at 2475; *Banks*, 2015 IL App (1st) 130985, ¶ 19.  We are therefore not

persuaded by defendant's argument that his rights under the eighth amendment were violated when he was subjected to a minimum sentence of 57 years' imprisonment.[3]

¶ 135       *ii. Constitutionality Under Proportionate Penalties Clause*

¶ 136   We next consider whether the firearm enhancement and consecutive sentencing statute, as applied to defendant, violate the proportionate penalties clause of the Illinois constitution. That clause provides "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.  The State contends that the proportionate penalties clause is coextensive with the eighth amendment, and that our resolution of defendant's eighth amendment challenge against him thus forecloses his argument here as well.  We find this argument unavailing.

¶ 137   In *People v. McDonald*, the Illinois Supreme Court stated that the proportionate penalties clause and eighth amendment are synonymous and coextensive with one another.  168 Ill. 2d 420, 455-56 (1995).  The court reiterated that holding in *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006) and *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 206 (2009).  However, in *People v. Clemons*, the court abrogated that holding, stating:

> "our conclusion in *McDonald* that 'article I, section 11 was
> synonymous with the cruel and unusual punishment clause of the
> eighth amendment' [citation] is an overstatement. Although a
> relationship may exist between the first clause of article I, section
> 11, and the eighth amendment, that relationship is not entirely
> clear. What is clear is that the limitation on penalties set forth in

---

[3]Defendant also obliquely argues that the 100-year sentence imposed by the trial court violated *Miller*.  While defendant's constitutional challenge to his 100-year sentence is mooted based on our resolution of his judicial bias claim, we note that the court arrived at its 100-year sentence as a result of its consideration of the evidence at the sentencing hearing, not as a result of any statute or statutes requiring the imposition of that penalty.

the second clause of article I, section 11, which focuses on the objective of rehabilitation, went beyond the framers' understanding of the eighth amendment and is not synonymous with that provision." 2012 IL 107821, ¶ 40.

¶ 138 Despite its holding in *Clemons*, however, two years later the Court again stated that the proportionate penalties clause and eighth amendment are coextensive. See *Patterson*, 2014 IL 115102, ¶ 106. This line of precedents has produced inconsistent results in the appellate court. Compare *Banks,* 2015 IL App (1st) 130985, ¶ 24 (quoting *Rodney H.*, 223 Ill. 2d at 518, to hold that protections afforded by proportionate penalties clause are coextensive with eighth amendment) and *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 58 (quoting *Patterson*, 2014 IL 115102, ¶ 106, to reject argument that, pursuant to *Clemons*, proportionate penalties clause affords defendants broader protections than eighth amendment) with *Gipson*, 2015 IL App (1st) 122451, ¶¶ 69-70 (rejecting argument that proportionate penalties clause is substantively coextensive with eighth amendment and instead holding that they are coextensive only insofar as they both apply only when a penalty has actually been imposed on the defendant).

¶ 139 We do not believe that *Patterson* abrogated *Clemons*. Each time the Illinois Supreme Court has stated that the proportionate penalties clause is coextensive with the eighth amendment, it has always clarified that it means the texts are coextensive in that they both apply only when the government has imposed a penalty on a defendant. See *Patterson*, 2014 IL 115102, ¶ 101 ("Under the definition of the plain language used, neither clause applies unless a punishment or penalty has been imposed."); *Konetski*, 233 Ill. 2d at 206-07 ("Our proportionate penalties clause is coextensive with the federal constitution's prohibition against cruel and unusual punishment. [Citation.] Both provisions apply only to the criminal process where the

government takes direct action to inflict punishment."); *Rodney H.*, 223 Ill. 2d at 518 (same).

Thus, if a statute does not inflict punishment, it implicates neither the eighth amendment nor the

proportionate penalties clause. However, when a punishment has been imposed, the

proportionate penalties clause provides greater protection. *Clemons*, 2012 IL 107821, ¶ 40.

Accordingly, we must independently analyze whether defendant's sentence violates the

proportionate penalties clause.

¶ 140     A challenge under the proportionate penalties clause "contends that the penalty in

question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216

Ill. 2d 481, 487 (2005). A violation may be shown where the penalty imposed is " 'cruel,

degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of

the community.' " *Id.* (quoting *People v. Moss*, 206 Ill. 2d 503, 522 (2003)).

¶ 141    "To determine whether a penalty shocks the moral sense of the community, we must

consider objective evidence as well as the community's changing standard of moral decency."

*People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008). In *People v. Sharpe*, 216 Ill. 2d 481

(2005), the supreme court explicitly upheld the constitutionality of the firearm enhancement

statute against a proportionate penalties clause challenge. The court explained that "it would not

shock the conscience of the community to learn that the legislature has determined that an

additional penalty ought to be imposed when murder is committed with a weapon that not only

enhances the perpetrator's ability to kill the intended victim, but also increases the risk that

grievous harm or death will be inflicted upon bystanders." *Id.* at 525. Thus, the Illinois Supreme

Court has held that subjecting defendants guilty of crimes involving firearms to substantial

mandatory minimum sentences does not shock the moral sense of the community.

¶ 142   This is so, even though the mandatory nature of the firearm enhancements restrict the scope of discretion which the trial courts may exercise during sentencing.  In *Sharpe*, the court explained that " 'the legislature's power necessarily includes the authority to establish mandatory minimum sentences, even though such sentences, by definition, restrict the inquiry and function of the judiciary in imposing sentence.' "  *Id.* (quoting *People v. Dunigan*, 165 Ill. 2d 235, 245 (1995)).  And in any event, trial courts operating under such sentencing regimes *do* retain discretion in imposing sentences.  See *Banks*, 2015 IL App (1st) 130985, ¶ 24.

¶ 143   Defendant nevertheless argues that *People v. Leon Miller*, 202 Ill. 2d 328 (2002), commands a different result.  We disagree.  In *Leon Miller*, the juvenile defendant was approached by two individuals who asked him to serve as a lookout.  *Id.* at 330-31.  Defendant agreed, and one minute later the individuals opened fire, killing two people.  *Id.*  Defendant was charged and convicted of two counts of first degree murder on an accountability theory, despite the fact that he never handled the guns used to commit the murders and ran away when the shots were fired.  *Id.*  After trial, the State asked the court to impose a life sentence under the multiple murder provision of the Unified Code of Corrections, which mandated a life sentence for defendants convicted of committing more than one murder.  *Id.* at 335-36 (quoting 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)).  The trial court refused to do so, explaining that it found the multiple murder statute unconstitutional as applied to the defendant.  *Id.* at 331-32.

¶ 144   The Illinois Supreme Court affirmed.  The court began its analysis by framing the issue as whether the multiple murder sentencing statute could be constitutionally applied "to a *juvenile* convicted upon a theory of *accountability*." (Emphasis in original)  *Id.* at 337.  The court explained that because (1) the automatic transfer statute mandates that all 15 year-olds charged with murder be tried in adult court; (2) "[t]he accountability statute (720 ILCS 5/5-2(c) (West

1996)) effectively bars courts from considering the offender's degree of participation in the crime by making all persons who participate in a common criminal design equally responsible"; and (3) the sentencing statute precludes courts from considering a defendant's age or degree of participation in the crime, "a court never considers the actual facts of the crime, including the defendant's age at the time of the crime or his or her individual level of culpability." *Id.* at 340. Thus, the court held that:

> "the penalty mandated by the multiple-murder sentencing statute as applied to this defendant is particularly harsh and unconstitutionally disproportionate. We agree with defendant that a mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole–the same sentence applicable to the actual shooter." *Id.* at 341.

The court noted, however, that its decision did not imply that such a sentence for juvenile convicted of murder under an accountability theory would never be appropriate. *Id.*

¶ 145   *Leon Miller* is distinguishable on multiple grounds.  First, we note that the court's holding in *Leon Miller* was based on the multiple-murder sentencing statute "*as applied to this*

*defendant*." (Emphasis added.) *Id*. Thus, the court did not announce a blanket rule of law, but rather turned on the peculiar facts of the case. Second, unlike the defendant in *Leon Miller*, defendant in the present case actually fired the shots after having longer than a mere minute to contemplate his actions. Thus, the fact that defendant faced a minimum sentence of 57 years' imprisonment cannot be described as a gross distortion of the "factual realities of the case." *Id*.

¶ 146 We also find that *People v. Brown*, 2015 IL App (1st) 130048 and *Gipson*, 2015 IL App (1st) 122451, are distinguishable. In *Brown*, a juvenile defendant was convicted of aggravated battery with a firearm and three counts of attempted first degree murder. *Brown*, 2015 IL App (1st) 130048, ¶ 1. The trial court sentenced the defendant to 50 years' imprisonment, consisting of 25 years for attempted first degree murder and 25 years for personally discharging a firearm that proximately caused great bodily harm. *Id.* In imposing sentence, however, the court relied on "speculative evidence" to support finding the existence of a "phantom aggravating factor that but for defendant's gun jamming, defendant would have caused more violence on the bus that day." *Id*. ¶ 44. The court further held that defendant's sentence, which would not permit his release until he was 66 years old, did not satisfy the constitutional requirement that all penalties serve the objective of restoring the offender to useful citizenship. *Id*. ¶ 45. The court explained that "[f]actors that weigh in favor of defendant's rehabilitative potential include his age, family support, and the fact that defendant was in high school" and had a limited criminal history. *Id.* Accordingly, the court reduced defendant's sentence to 31 years' imprisonment. *Id*. ¶ 47.

¶ 147 *Brown* is distinguishable from the present case. Unlike in *Brown*, defendant murdered one of his victims. Murder is recognized as the most serious offense a person can commit. Moreover, the conclusion that defendant's sentence did not adequately account for his

rehabilitative potential was inescapable in light of the fact that the court considered improper aggravating factors.

¶ 148   In *Gipson*, the juvenile defendant was convicted of attempted murder and sentenced to a cumulative 52 year prison term.  2015 IL App (1st) 122451, ¶ 1.  The appellate court reversed and remanded to the trial court with instructions to conduct a retroactive fitness hearing.  *Id.* ¶ 38.  The court found, however, defendant's 52-year sentence violated the proportionate penalties clause and therefore provided the trial court with the additional instruction that, in the event it found that defendant was fit to stand trial, then he should be resentenced without applying the firearm enhancement.  *Id.* ¶¶ 69, 78.

¶ 149   *Gipson* is distinguishable for several reasons.  First, as in *Brown* and unlike the present case, the defendant in *Gipson* was convicted of attempted murder; he did not actually kill his victim.  *Id.* ¶ 1.  Second, the defendant in *Gipson* had once been found unfit to stand trial; no similar finding was ever entered in the present case.  Third, unlike in *Gipson*, the facts in the present case show that defendant planned his crime.  *Id.* ¶ 73.  Specifically, defendant met with confederates away from the crime scene, obtained a gun and hoodie, walked to the bus stop, looked into the bus to ensure that his target was inside, and after the crime fled and boasted "I just laid down the murder game."

¶ 150   Based on the foregoing, we find that the application of the consecutive sentencing statute and firearm enhancement to defendant, resulting in a minimum sentence of 57 years' imprisonment, does not violate the proportionate penalties clause of the Illinois Constitution.

¶ 151                              E.  Mittimus Correction

¶ 152   The mittimus reflects that defendant was convicted of two counts of first degree murder based on counts V and VI of the indictment.  However, because defendant killed one victim

only, his dual murder convictions cannot stand under the one-act, one-crime doctrine.  See

*People v. Guest*, 115 Ill. 2d 72, 103-04 (1986).  Accordingly, defendant's conviction on count VI

is vacated and the mittimus is corrected to reflect that defendant was convicted of first degree

murder (see 720 ILCS 5/9-1(a)(1) (West 2006)), two counts of aggravated battery with a firearm,

and imposition of an additional 25-year sentence as a result of the firearm enhancement.

¶ 153                                CONCLUSION

¶ 154   We affirm the decisions of the trial court in all respects, except that we vacate

defendant's sentence and remand the case for resentencing before a different judge.  On remand,

if resentencing takes place under the law as it exists at the time this opinion is filed, the trial

court may impose any sentence between 57 and 100 years' imprisonment.  However, the new

sentence may not be longer than the original sentence.  See 730 ILCS 5/5-5-4(a) (West 2014).

We also correct the mittimus to reflect a conviction on one, rather than two, murder counts.

¶ 155   Affirmed in part, vacated in part, and remanded with instructions; mittimus corrected.