2016 IL App (1st) 141744
No. 1-14-1744
Opinion filed December 27, 2016

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 11 CR 11184 |
| DARIEN HARRIS, | ) ) ) | The Honorable Nicholas Ford, |
| Defendant-Appellant. | ) ) ) ) | Judge, presiding. |

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Neville concurred in the judgment and opinion.
Justice Mason concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1       On June 7, 2011, Rondell Moore and Quincy Woulard were each shot several times at a Chicago gas station. Moore died of his wounds, after fleeing the station on foot. Woulard survived. After a bench trial, the court convicted defendant Darien Harris of first degree murder in Moore's death and attempted first degree murder of Woulard, and sentenced Harris to an aggregate term of 76 years of imprisonment.

¶ 2        On appeal, Harris argues that the evidence was insufficient to support his convictions, but we find that a reasonable trier of fact could credit the eyewitnesses who saw Harris shoot Moore and Woulard. He also raises an as-applied challenge to his sentence, contending that it contravenes the Illinois Constitution. Ill. Const. 1970, art. I, § 11. We agree. Without diminishing the seriousness of Harris's crimes, we believe it shocks the moral sense of the community to impose what amounts to a life sentence on Harris, who turned 18 just a few months before the shooting, thereby eliminating any chance of Harris becoming a contributing member of society. Finally, we direct the clerk of court to correct the *mittimus* to reflect Harris's conviction for only one count of attempted first degree murder.

¶ 3                            BACKGROUND

¶ 4        Ronald Moore testified that on June 7, 2011, he and his younger brother Rondell Moore drove into a BP gas station at the corner of Stony Island and Marquette on the south side of Chicago. Rondell was having car trouble. He put up the car's hood and a local mechanic, Quincy Woulard, arrived on his bike and was helping Rondell with the car's engine. Ronald stayed in the back seat.

¶ 5        Ronald saw a black Lexus pull into the gas station parking lot from Marquette. Ronald had seen the car on Cottage Grove a few days before, and recognized the driver from the neighborhood of 65th and Minerva (though Ronald did not know the driver's name). The Lexus drove around the station office until Ronald could not see it. Ronald then heard a number of gunshots—more than five. Ronald looked out the back passenger's side window and saw Harris shooting a chrome handgun at Rondell. Ronald recognized Harris from the Minerva neighborhood, but did not know his name. Harris was only a few feet away from Ronald during the shooting.

¶ 6        Rondell ran, hopped over a fence along the gas station's property, and went towards the parking lot of a Chase bank situated next door to the gas station. Harris continued shooting as Rondell fled. Ronald was unable to leave the car through the passenger's side door, so he scooted across the seat towards the driver's side. Harris was still shooting at Woulard, and suddenly pointed the gun at Ronald and pulled the trigger. Ronald heard a click, but the gun did not fire. Harris then ran towards Stony Island.

¶ 7        Ronald got out of the car, chased Harris a few feet, and turned to find his brother. Meanwhile, the Lexus drove through the Chase parking lot and Ronald could only see one person (the driver).

¶ 8        When the police arrived, Ronald heard a message over a police radio that the Lexus had been found at a Walgreens drug store, across the street from the Chase bank. Ronald ran to the Walgreens and recognized the Lexus. He told police the driver killed Rondell, but testified at trial that the driver was not actually the shooter. He did not see Harris in the Lexus at that time.

¶ 9        A couple days after the shooting, a neighborhood acquaintance showed Ronald a YouTube video of a black Lexus. Ronald recognized both the Lexus's driver and the shooter, though he did not know their names. He informed police, and eight days after the shooting, at a lineup, Ronald identified Harris as the shooter.

¶ 10        Dexter Saffold testified that he used his scooter to go to a restaurant in the neighborhood that evening. He was rolling northbound on Stony Island in front of the BP station when he heard gunshots. Saffold froze, and saw the shooter from about 18 feet away. The shooter was holding a dark handgun, and Saffold could see the muzzle flashes and heard more than two gunshots. Saffold could see the shooter aiming the gun at a person near a car with its hood up, and another man on a bicycle in the same area. The shooter ran past Saffold, bumping into him, and almost

dropped the gun while trying to put it into his pocket. Saffold saw another person running behind the fence, which had some openings in it. The shooter ran behind the Chase bank, out of Saffold's view. Saffold went to the gas station to call 911 and saw a man lying on the ground by the car and bicycle. Saffold spoke to the police when they arrived, and on June 15, 2011, identified Harris in a lineup as the shooter.

¶ 11     Quincy Woulard testified that he often assisted people with car repairs at the BP station. He saw his friend "Blink" (Rondell Moore) at the station, who asked Woulard to look at his car because it was overheating. While Woulard was looking under the hood, he heard three shots and then fell to the ground. Someone said, "he running down the alley," and Woulard saw someone was running in the alley. Woulard had been shot three times, but did not see who shot him.

¶ 12     Aaron Jones testified that on June 7, 2011, he was driving a black Lexus in the area of Minerva, Stony Island, and 65th, selling marijuana. A man he knew as "Chucky" (Harris) waved at him to stop and asked Jones for a ride to the gas station. Jones drove "Chucky" to the BP station at 66th and Stony Island, and dropped him off in the parking lot. Jones then left and headed home, but then backtracked to buy cigarettes at a drugstore at 67th and Stony Island. Before he could reach the store, Jones was pulled over by police. He later identified Harris to police.

¶ 13     During his testimony, Jones recanted his statement to police, now testifying that Harris had not been in Jones's car and that the police had coerced Jones into making the statement and identification by threatening him with jail. Police officers testified that they had not pressured Jones to identify Harris.

¶ 14     During closing argument, the State noted that it was not required to prove motive, but theorized that there was "some sort of beef" between Harris and the Moore brothers. The trial

court found Harris guilty of Rondell Moore's murder, basing its guilty verdict on Saffold's testimony: "among all the witnesses that I heard from, his testimony was unblemished by any of the cross-examination," and he corroborated Ronald Moore's and Jones's testimony. The trial court indicated that some "inconsistencies" in the testimony did not create a reasonable doubt. The court said Jones's recantation might have been motivated by fear due to his own involvement in the crime. The trial court also found Harris guilty of the attempted first degree murder of Woulard.

¶ 15       Before sentencing, Harris's counsel presented evidence of his lack of prior criminal record, supportive family, and educational achievements while in prison. After stating it had considered all the appropriate factors, the trial court commented, "I am sorry that the sentencing parameters are such that my options are somewhat limited. Although, I do feel you should be treated seriously." The trial court sentenced Harris to 45 years of imprisonment on the murder conviction: 20 years for the offense plus 25 years for the mandatory firearm enhancement. The trial court also sentenced Harris on three counts of attempted murder: 26 years for Count 71 (6 years plus 20 years for the mandatory firearm enhancement); 31 years for Count 72 (6 years plus 25 years enhancement); and 31 years for count 73 (6 plus 25). The attempted murder counts were to run concurrently with each other, but consecutively to the murder sentence. Finally, the court sentenced him to 20 years for aggravated battery, concurrent with the attempted murder sentences. Harris's aggregate sentence was 76 years.

¶ 16                                                        ANALYSIS

¶ 17        Evidence Sufficient to Prove Harris Guilty Beyond a Reasonable Doubt.

¶ 18       The relevant inquiry when challenging the sufficiency of the evidence involves, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). As a reviewing court, we will not substitute our judgment for that of the trier of fact on questions concerning the weight of the evidence or the credibility of the witnesses. *Id*. at 375. And, we will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id*.

¶ 19                                        First Degree Murder

¶ 20          Harris argues that there was insufficient evidence to convict him of first degree murder of Rondell. A person commits first degree murder if, in performing the acts that cause a death, he or she either intends to kill or do great bodily harm to the victim or another individual, knows that the acts will cause the victim's or another's death, or knows the acts create a strong probability of death or great bodily harm to the victim or another. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2008).

¶ 21          According to Harris, Rondell was not shot at the gas station, but rather in the Chase bank parking lot, and that this is shown by the lack of a blood trail from the gas station to the bank, and the possibility that two different firearms were used in the crime. Since no witnesses were there, and no evidence tied Harris to a gun, there must have been a second shooter at the bank, and Harris could not be proven guilty of Rondell's murder.

¶ 22          The problem with Harris's theory is that it is not supported by evidence in the record. Harris states that, since Rondell managed to flee from the gas station to the bank parking lot, he could not have been shot until he reached the bank (based on the injuries he suffered). But neither party at trial presented evidence as to what physical feats Rondell would, or would not, have been capable of after being shot at the gas station. Harris is merely asking us to speculate on the stipulated medical evidence. But even if we were to accept Harris's theory that Rondell

was not shot until after he fled to the Chase parking lot, a reasonable trier of fact could conclude that the man who shot Woulard in the BP parking lot and chased Rondell to the Chase bank parking lot was the same man who shot Rondell in the Chase parking lot. Thus, the lack of a blood trail does not exculpate Harris. Similarly, even if Rondell was shot with a different gun than Woulard, there was nothing preventing Harris from carrying two firearms during the crime.

¶ 23     The lack of evidence tying Harris to a gun does not change this conclusion. Both Ronald Moore and Dexter Saffold identified Harris as the man who fired a gun in the BP parking lot. Though Ronald Moore's credibility could be challenged based on his apparent animosity towards Harris (and others from Harris's neighborhood), Dexter Saffold had no connection to either the victims or Harris, and the trial court found Saffold credible. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 30 (testimony of single eyewitness sufficient to convict if eyewitness credible and able to view defendant under conditions permitting positive identification). (This leaves aside Aaron Jones who recanted.) Harris's citation to *In re Nasie M.*, 2015 IL App (1st) 151678, does not help his cause; in *Nasie M.*, the evidence was insufficient to support Nasie's conviction because there was no medical or forensic evidence, and also no eyewitnesses. 2015 IL App (1st) 151678, ¶ 37.

¶ 24     Moore's and Saffold's credibility also finds support in the surveillance video from the gas station, which depicts a sequence of events in line with their descriptions: the victims' arrival at the gas station by car and bike; a black Lexus dropping off a passenger on the other side of the gas station; the shooter walking towards the victims; and the victims' attempts to flee. (The angle of the video camera prevented the shooting from being captured on tape.) From this evidence, a reasonable trier of fact could conclude that Harris was the man who shot Rondell Moore,

whether those shots were fired in the BP parking lot, during the flight from there, or in the Chase bank parking lot.

¶ 25                    Attempted First Degree Murder

¶ 26        Harris also challenges his convictions for the attempted murder of Quincy Woulard. A person commits attempted murder when, with intent to commit murder, he or she takes any substantial step towards committing murder. 720 ILCS 5/8-4(a), 9-1 (West 2008). Harris argues that Woulard was an "unintended" victim because Rondell was the actual target, and thus there was no evidence that Harris had the specific intent to kill Woulard.

¶ 27        Harris is incorrect. Since defendants rarely admit it explicitly, their specific intent may be shown by surrounding circumstances, including "the character of the assault [and] the use of a deadly weapon." *People v. Migliore*, 170 Ill. App. 3d 581, 586 (1988). Woulard testified that he was looking at a car's engine when he heard gunshots and fell to the ground; he suffered three gunshots wounds. A reasonable trier of fact could infer that shooting a defenseless person multiple times evinces a specific intent to kill that person. See *id.* (intent may be inferred if defendant performs an act with direct and natural consequence of destroying another's life).

¶ 28        But Harris argues that the State is precluded from arguing this theory of intent because at trial, it argued only that Rondell was the target and Woulard was merely an innocent bystander. Harris relies primarily on *People v. Homes*, 274 Ill. App. 3d 612 (1995). In *Homes*, the State explicitly and consistently argued that Homes intended to kill Shelly, but missed and shot another person, Moore, by accident. *Id.* at 620-21. Homes was acquitted of the attempted murder of Shelly but convicted of the attempted murder of Moore. *Id.* The Homes court held that this

legally inconsistent verdict could not stand, and the State could not change its theory from one of "transferred intent" at trial to arguing that Homes intended to kill Moore all along. *Id.*

¶ 29        But *Homes* differs significantly from this case. The State did not limit itself to arguing that Rondell was the intended victim and Woulard was an innocent bystander. In its opening argument, the State asserted that Harris had shot both Rondell and Woulard; in closing argument, the State argued that it did not need to prove motive behind the shootings (but theorized "some sort of beef" had arisen between Harris and the Moore brothers). Nor did Harris's trial produce the type of legally inconsistent verdicts present in *Homes*. Moreover, the evidence showed Harris approach the unsuspecting victims and fire multiple times, hitting two people. An intent to kill the intended victim can be transferred to another person also harmed where the defendant uses a deadly weapon "indiscriminately" against a group of people. *People v. Ephraim*, 323 Ill. App. 3d 1097, 1108-09 (2001).

¶ 30                    Harris's 76-Year Sentence Violates the Illinois Constitution.

¶ 31        Harris challenges his 76-year sentence under both the Eighth Amendment and under Illinois's "proportionate penalties" clause. The sentencing statutes mandated that the trial court add firearm enhancements to his sentences for murder and attempted murder; that his murder and attempted murder sentences be served consecutively; and that he must serve the entire murder sentence and 85 percent of the attempted murder sentence. See 735 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008) (25 years to be added to murder sentence if firearm used proximately causes death); 720 ILCS 5/8-4(c)(1)(D) (West 2008) (25 years to be added to attempted murder sentence if firearm used proximately causes great bodily harm); 730 ILCS 5/5-8-4(d)(1) (West 2008) (murder and attempted murder sentences to be served consecutively); 730 ILCS 5/3-6-3(a)(2)(i)-

(ii) (West 2008) ("truth in sentencing" mandates defendant must serve 100 percent of murder sentence and 85 percent of attempt murder sentence).

¶ 32    Even though the trial court sentenced Harris at the bottom of the applicable ranges, his aggregate sentence totals 76 years (of which Harris must serve at least 71 years). Harris alleges that this lengthy term is actually a "mandatory de facto life sentence," and the interaction of these statutes prevented the trial court from exercising any discretion or taking into account his youth or rehabilitative potential. This statutory scheme, according to Harris, violates both the federal and state constitutions as applied to him.

¶ 33    We presume that statutes are constitutional and will uphold them whenever reasonably possible. *People v. Patterson*, 2014 IL 115102, ¶ 90. Harris has the burden of rebutting this presumption; we will review his constitutional challenge *de novo*. *People v. Aikens*, 2016 IL App (1st) 133578, ¶ 29.

¶ 34    The Illinois Constitution and the Eighth Amendment

¶ 35    Harris challenges these statutes under both the eighth amendment of the federal constitution and the "proportionate penalties" clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). As an initial matter, the parties disagree whether the so-called proportionate penalties clause is more protective of a defendant's rights than the eighth amendment. Both parties support their arguments with precedent from the Illinois Supreme Court as well as the appellate court.

¶ 36    In *People v. Clemons*, the Illinois Supreme Court explained that, while there is a connection between the "proportionate penalties" clause and the eighth amendment, the proportionate penalties clause "went beyond the framers' understanding of the eighth amendment and is not synonymous with that provision." 2012 IL 107821, ¶ 40. *Clemons* came to

this conclusion after examining the more expansive language of the proportionate penalties clause and the legislative history of the Illinois constitutional convention that drafted the clause. *Id*. ¶¶ 36-39. The language requiring penalties to be determined "with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, § 11) was specifically added in 1970 to bring the constitution in line with modern thinking on penology. *Clemons*, 2012 IL 107821, ¶ 39.

¶ 37 Two years later, however, the Illinois Supreme Court stated that the proportionate penalties clause is "co-extensive" with the eighth amendment (although it did so without discussing *Clemons*). *Patterson*, 2014 IL 115102, ¶ 106. Some appellate courts have followed *Clemons*, while others have relied on *Patterson*. Compare *People v. Gipson*, 2015 IL App (1st) 122451, ¶¶ 69-70 (following *Clemons*), with *Aikens*, 2016 IL App (1st) 133578, ¶ 23 (following *Patterson*).

¶ 38 We agree with *People v. Pace*, 2015 IL App (1st) 110415, ¶¶ 136-139, that *Patterson* did not abrogate *Clemons* and that the proportionate penalties clause is more expansive than its federal counterpart. See also *People v. Wilson*, 2016 IL App (1st) 141500, ¶ 38 (following *Pace*).

¶ 39 The eighth amendment prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. This applies to the states through the Fourteenth Amendment. *Roper v. Simmons*, 543 U.S. 551, 560 (2005).

¶ 40 The Illinois constitution provides, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. This clause is generally referred to as the "proportionate penalties" clause, but the second half of the section would be better considered as its own concept: the "rehabilitation" clause. See *Clemons*, 2012 IL 107821, ¶ 37 (noting difference between two clauses of section 11). The mandate that all criminal penalties be

determined "with the objective of restoring the offender to useful citizenship" is no less a requirement than the rest of the section, and has yet to receive the scrutiny and attention it properly deserves as a distinctive component of Illinois' constitution.

¶ 41    Harris may show a violation of this clause if his sentence is "cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." (Internal quotation marks omitted.) *Aikens*, 2016 IL App (1st) 133578, ¶ 33. As society evolves, "so too do our concepts of elemental decency and fairness which shape the moral sense of the community." (Internal quotation marks omitted.) *People v. Miller*, 202 Ill. 2d 328, 339 (2002). So we must consider objective evidence and "the community's changing standard of moral decency." (Internal quotation marks omitted.) *Aikens*, 2016 IL App (1st) 133578, ¶ 33.

¶ 42    We will first consider the constitutionality of the individual statutes affecting Harris's sentence before turning to the overall effect of the statutory scheme.

¶ 43                              Firearm Enhancements

¶ 44    When a firearm is involved in the commission of certain felonies, the Illinois legislature has "add[ed] a mandatory additional term of years to whatever sentence would otherwise be imposed." *People v. Sharpe*, 216 Ill. 2d 481, 484-85 (2005). The legislature intended to impose a greater penalty when firearms are used or discharged to "deter the use of dangerous weapons and firearms during the commission of a felony offense." *People v. Guyton*, 2014 IL App (1st) 110450, ¶ 58; see 720 ILCS 5/33A-1(b) (West 2008) (discussing legislative intent). In accordance with this goal, the statute adds a mandatory minimum 25-year enhancement to the sentence if, during the commission of a specified offense, the offender personally discharged a

firearm that proximately caused great bodily harm or death. 730 ILCS 5/5-8-1(1)(d)(iii) (West 2008).

¶ 45     Illinois courts have repeatedly upheld the constitutionality of the mandatory firearm enhancement statute when reviewing adult defendants' sentences. *Sharpe*, 216 Ill. 2d at 519-21; *Guyton*, 2014 IL App (1st) 110450, ¶ 62. In *Sharpe*, the Illinois Supreme Court stated that "it would not shock the conscience of the community to learn that the legislature has determined that an additional penalty ought to be imposed when murder is committed with a weapon that not only enhanced the perpetrator's ability to kill," but also increased the risk that bystanders would suffer grievous harm or death. *Sharpe*, 216 Ill. 2d at 519; see also *Pace*, 2015 IL App (1st) 110415, ¶ 141. This statute is not unconstitutional as applied to Harris.

¶ 46                                         Consecutive Sentencing

¶ 47     The consecutive sentencing statute also is not unconstitutional as applied to Harris. Illinois courts have repeatedly upheld the constitutionality of consecutive sentences. See, *e.g.*, *People v. Wagener*, 196 Ill. 2d 269, 285-86 (2001) (because each individual sentence is within statutory range, sentences running consecutively does not render an aggregate sentence unconstitutional). Illinois courts have found the consecutive sentencing statute to be constitutional, even applied to juvenile defendants, because a "defendant's aggregate prison term was different from a sentence of life without parole because a life sentence is '[n]ot an accumulation of sentences,' but rather 'is tied to a single conviction and is absolute in its duration for the offender's natural life.' " *Pace*, 2015 IL App (1st) 110415, ¶ 131 (quoting *People v. Gay*, 2011 IL App (4th) 100009, ¶ 23).

¶ 48                                         Truth in Sentencing

¶ 49       The "truth in sentencing" statutes mandate that Harris serve all of his murder sentence and at least 85 percent of the attempted murder sentence. These statutes "[do] not change the sentence actually imposed ***. [Citation.] Rather, [they] determine[ ] the percentage to be actually served, which in turn depends upon the conduct of the defendant while serving that sentence." *People v. Harris*, 2012 IL App (1st) 092251, ¶ 24. Because the statutes do not affect the sentencing ranges for each crime, they do not violate the proportionate penalties clause *id*. ¶¶ 19, 25, and are not unconstitutional as applied to Harris.

¶ 50                   Harris's Aggregate Sentence Equates to a *De Facto* Life Sentence.

¶ 51       Beyond each individual component, Harris argues that the overall effect of the sentencing scheme left the trial court with no choice but to give him a "mandatory *de facto* life sentence."

¶ 52       Recently, Illinois courts have explored this concept in the context of juvenile sentencing. In *People v. Reyes* (which was issued after the parties briefed Harris's appeal), the Illinois Supreme Court accepted the State's concession that a 97-year sentence for a 16-year-old was a *de facto* life sentence because such a sentence is "unsurvivable" and "cannot be served in one lifetime." 2016 IL 119271, ¶¶ 8-9. See also *People v. Sanders*, 2016 IL App 121732-B, ¶¶ 25-27 (finding that 100 year sentence for juvenile was effectively life sentence); *People v. Nieto*, 2016 IL App (1st) 121604, ¶ 42 (78 year sentence for juvenile that would keep him imprisoned until age 94 is effective life sentence). Our appellate courts have split on this question, and whether it is even appropriate for a court of review to wade into a question of biology and statistics: "Is it simply a certain age upon release? If so, is it age 65, as defendant seems to argue for in his appellate brief, or 90? Should the age vary by ethnicity, race or gender? If we are going to consider more than age, what societal factors or health concerns should impact our assessment of

a de facto life sentence[?] These are policy considerations that are better handled in a different forum." *People v. Jackson*, 2016 IL App (1st) 143025, ¶ 57.

¶ 53    In *Gipson*, the court did grapple with these questions before concluding that since a 52-year sentence would allow the juvenile Gipson to be released at age 60, which was lower than his average life expectancy, the sentence was not a life sentence. 2015 IL App (1st) 122451, ¶¶ 65-67. In *Sanders*, the court noted that incarceration itself reduces life expectancy. 2016 IL App (1st) 121732-B, ¶¶ 25-27 (quoting study showing that each year in prison results in two-year decline in life expectancy). Not surprising, given the harshness of a lifetime spent in a state penitentiary. See *People v. Collins*, 2015 IL App (1st) 131145, ¶¶ 52-53 (Hyman, J., dissenting).

¶ 54    We conclude that Harris's 76-year sentence is a *de facto* life sentence; at best, he would be released at age 89. See *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 18 (105-year sentence for 19-year-old, resulting from mandatory firearm enhancements, mandatory consecutive sentencing, and truth in sentencing laws, is "de facto life sentence," though not excessive).

¶ 55                Harris's Sentence Does Not Violate the Eighth Amendment.

¶ 56    In recent years, the United States Supreme Court has held that the eighth amendment protects juvenile offenders from capital punishment or mandatory life imprisonment without parole. *Roper*, 543 U.S. at 578-79; *Graham v. Florida*, 560 U.S. 48, 82 (2010); *Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2475 (2012). These holdings were grounded in the Court's concern, based on scientific research about adolescent brain development, that juveniles lack maturity, are more vulnerable to bad influences, and are more amenable to rehabilitation. *Roper*, 543 U.S. at 570. But the Court drew a line between juveniles and adults at the age of 18 years; while it acknowledged that the line was arbitrary, it "must be drawn." *Id*. at 574. Harris

falls on the adult side of that line; therefore, the Eighth Amendment does not protect Harris from what it is effectively a life sentence and we reject any challenge on this ground.

¶ 57                                    Harris's Sentence Violates the Rehabilitation Clause.

¶ 58        We hold that Harris's 76-year sentence violates article I, section 11 of the Illinois Constitution, with its language mandating that penalties should have "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 59        As early as 1899, Illinois recognized the inherent and fundamental differences between juveniles and adults when it passed the Illinois Juvenile Court Act, which created a separate juvenile court system. 1899 Ill. Laws 130. In response to *Miller*, Illinois enacted a new sentencing scheme for juveniles. Pub. Act 99-69 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105). This statute requires the sentencing trial court judge to consider several mitigating factors when determining the appropriate sentence for those under 18. *Reyes*, 2016 IL 119271, ¶ 11. The trial court may decline to impose otherwise-mandatory sentencing enhancements based on the possession or use of a firearm during the commission of the offense. .Pub. Act 99-69 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105(b)).

¶ 60        Section 5-4.5-105's new statutory language and *Roper*, *Graham*, and *Miller* "stand for the proposition that a sentencing body must have a chance to take into account mitigating circumstances, i.e., a juvenile's age and attendant circumstances, before sentencing the juvenile to the harshest possibility penalty." (Internal quotation marks omitted.) *Wilson*, 2016 IL (1st) 141500, ¶ 27. The new statutory scheme and the preceding case law incorporate the separation of powers doctrine and reinstate judicial discretion in juvenile sentencing.

¶ 61        The Illinois Supreme Court has recognized that research on juvenile maturity and brain development might also apply to young adults. The 19-year-old defendant in *People v.*

*Thompson* argued, for the first time on appeal, that *Miller* should apply with equal force to him. 2015 IL 11815, ¶¶ 18-21. The Illinois Supreme Court noted that in as-applied challenges, "it is paramount that the record be sufficiently developed" and that Thompson's record failed to contain any information regarding how the " 'evolving science' on juvenile maturity and brain development" should apply to the circumstances in the case. *Id*. ¶ 38. Though the Illinois Supreme Court did not extend *Miller* to young adults in *Thompson*, it did open the door for that argument.

¶ 62        Unlike the dissent, we believe the record contains sufficient facts to consider *Miller*'s applicability. We cannot extend *Miller*'s holding directly, but find that its analysis applies with equal force under the Illinois Constitution to a 19-year-old like Harris.

¶ 63        We agree with the analysis of *People v. House*, 2015 IL App (1st) 110580. House was 19 years old when he acted as a lookout during two killings; he was convicted of both murders and aggravated kidnapping on an accountability theory.*Id*. ¶¶ 24, 82. These convictions mandated a sentence of natural life imprisonment. *House* found that this "shock[ed] the moral sense of the community," because although House was young, lacked any prior violent convictions, and acted only as a lookout during the murders, the trial court was prevented from taking any of this information into account in sentencing him. *Id*. ¶ 101.

¶ 64        All sentencing cases are fact-specific, but Harris is similar to *House* in some important ways. Like House, Harris was young (although neither qualifies as a juvenile) when he committed his crimes. Like House, Harris had no violent criminal history; in fact, Harris had no criminal history at all. Harris's responsibility for his crimes was much greater than House's, but Harris has additional attributes arguing for his rehabilitative potential. Harris had grown up in a stable family environment, and those family members continued to support him through his

sentencing. Harris was finishing high school when he committed the murders and completed his GED while in pretrial custody. The dissent rightly argues that Harris's stable home life is not a mitigating factor; however, that evidence, along with his educational achievements, does support the notion that Harris might be able to rehabilitate himself if given the opportunity. Or, in the words of our constitution, might be able to restore himself to "useful citizenship." The confluence of sentencing statutes, which the trial court was required to apply, is absolutely contrary to that constitutional objective of the rehabilitation clause.

¶ 65    The dissent argues that Harris is more similar to the defendant in *People v. Ybarra*, 2016 IL App (1st) 142407. The 20-year-old Ybarra was convicted of murdering three teenagers; while yelling racial slurs, Ybarra opened fire from a moving car as the victims left their high school. *Id.* ¶¶ 7-10. At sentencing, Ybarra's counsel presented evidence that Ybarra's upbringing included extreme poverty, physical abuse, and drug use by both parents, and that Ybarra himself had a low IQ with developmental disabilities. *Id.* ¶ 17. The *Ybarra* court refused to apply *House*'s analysis because Ybarra had been the shooter. *Id.* ¶ 27.

¶ 66    Like Ybarra, Harris shot the victims. But the record shows that Harris has rehabilitative potential (as explained). The trial court sentencing Ybarra stated outright that Ybarra had no rehabilitative potential. *Id.* ¶ 32. The trial court here expressed its dissatisfaction with the high sentence it was required to give. The trial court sentencing Ybarra characterized his actions as "incomprehensible," "antisocial," and "evil," before stating that "[e]ven if the statute *** allowed me to give some discretion, you would get a sentence of life imprisonment from me" because "you should never be free." (Internal quotation marks omitted.) *Id.* ¶ 32.

¶ 67    Though House was over 19-years-old at the time of the offense, the *House* court based much of its analysis on the idea that, as a teenager, House was more similar to a juvenile than a

full-grown adult. The court further noted that "[r]esearch in neurobiology and developmental psychology has shown that the brain doesn't finish developing until the mid-20s, far later than was previously thought. Young adults are more similar to adolescents than fully mature adults in important ways. They are more susceptible to peer pressure, less future-oriented and more volatile in emotionally charged settings." (Internal quotation marks omitted.) *House*, 2015 IL App (1st) 110580, ¶ 95; see also *Roper*, 543 U.S. at 574 ("The qualities that distinguish juveniles from adults do not disappear when an individual turns 18.").

¶ 68        The same reasoning applies to Harris. And many of the concerns and policies underlying our juvenile court system apply with equal force to a person of Harris' age. The dissent argues that, if we hold Harris's sentence unconstitutional based on his youth, there will be no way to differentiate between him and other offenders who are older but might have a plausible argument of immaturity. This is a red herring. Again, all as-applied challenges are necessarily fact-specific; in upholding Harris's constitutional challenge, we are merely saying that his sentencing should have been similarly specific to his own circumstances, to effectuate the constitutional mandate of restoring Harris to useful citizenship.

¶ 69        While we do not minimize the seriousness of Harris's crimes, we believe that it shocks the moral sense of the community to send this young adult to prison for the remainder of his life, with no chance to rehabilitate himself into a useful member of society. The dissent argues that the remedy to Harris's sentence should lie only in the legislature. But regardless of legislative action (or inaction), the judiciary has the function, and, unquestionably, the responsibility to strike down a sentence when it violates the Illinois Constitution. See *People v. Miller*, 202 Ill. 2d 328, 336 (2002) (legislature's power to prescribe mandatory sentences "not without limitation; the penalty must satisfy constitutional constrictions").

¶ 70    We have upheld Harris's constitutional challenge, but we would be remiss not to look at the larger picture. The legislature has the authority to "establish mandatory minimum sentences, even though such sentences, by definition, restrict the inquiry and function of the judiciary in imposing [a] sentence." (Internal quotation marks omitted.) *Pace*, 2015 IL App (1st) 110415, ¶ 142. Over the course of decades, our legislature has responded to crime by toughening sentencing statutes; the length of a sentence grows ever-higher and yet crime does not disappear.

¶ 71    Further, the trial court could not tailor the sentence to fit Harris's particular circumstances; the statutes did not merely restrict the trial court's discretion, but rather eliminated it. The statutes hemmed the trial court in, particularly the firearm enhancements, which had an outsized effect on the length of the sentence. For example, the mandated 20-year firearm enhancement was over three times the length of the penalty for the attempt murder sentence; in a juvenile case, we found such a proportion "unsettling." *Gipson*, 2015 IL App (1st) 122451, ¶ 76. Similarly, the 25-year firearm enhancement for murder was longer than the actual murder sentence. Our new juvenile sentencing scheme specifically allows trial courts discretion whether to impose these enhancements. Pub. Act 99-69 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105(b)).

¶ 72    We realize that if the firearm enhancements had not applied, the trial court might well have sentenced Harris above the minimum for both murder and attempted murder. But the application of these enhancements prevented the trial court from constructing a sentence that had any chance of returning Harris to society, even if the court thought that Harris was a good candidate to rehabilitate himself.

¶ 73    We urge the legislature to consider the research regarding brain development in young adults who are not legally juveniles when analyzing the sentencing statutes for adults, including

consecutive sentencing, truth in sentencing, and mandatory sentencing enhancements. See *Decatur*, 2015 IL App (1st) 130231, ¶ 18 (urging legislature to improve sentencing schemes—including mandatory firearm enhancements, consecutive sentencing, and truth in sentencing—that result in lengthy sentences without allowing trial courts to consider mitigation, including youth). These statutory provisions strip judicial discretion when our criminal justice system would be better served by a case-by-case analysis in which the sentence imposed is individualized to the offender and the offense.

¶ 74                              Correction of Mittimus

¶ 75        Finally, Harris argues that the trial court should not have convicted and sentenced him on three separate counts of attempted first degree murder, as this violated the "one act, one crime" doctrine. The State agrees. We direct the clerk to correct the mittimus to reflect only one count of attempted first degree murder (count 72). *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 84.

¶ 76        Harris's convictions are affirmed. We vacate his 76-year sentence and remand for resentencing. The clerk must correct the mittimus *to* reflect Harris's conviction for count 72, attempted first degree murder.

¶ 77        JUSTICE MASON, concurring in part and dissenting in part:

¶ 78        I concur in the majority's determination that the evidence was sufficient to convict Harris of first degree murder and attempted first degree murder, but I respectfully dissent from the majority's further determination that Harris's 76-year sentence violated the proportionate penalties clause of the Illinois Constitution.

¶ 79        Initially, I disagree with the majority's extension of *Miller* beyond juveniles to young adults. The majority correctly notes that in *Thompson*, the supreme court declined to address the 19-year-old defendant's argument for *Miller*'s extension due to the insufficiency of the record,

while leaving open the possibility it would consider the argument in an appropriate case. *Thompson*, 2015 IL 118151, ¶¶ 38-39. But the record is similarly insufficient in this case. Harris raises the argument that *Miller*'s reasoning should be applied to him for the first time on appeal. Just like *Thompson*, Harris did not introduce evidence in the trial court that the " 'evolving science' on juvenile maturity and brain development" on which the court's opinion rested in *Miller* (*id.* ¶ 38), applied to him. See also *People v. Rizzo*, 2016 IL 118599, ¶ 26 ("A court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional 'as applied' is premature.") (quoting *People v. Mosley*, 2015 IL 115872, ¶ 47). Given the supreme court's admonishment that the record must be "sufficiently developed" to mount an as-applied challenge (*Thompson*, 2015 IL 118151, ¶ 37), I believe we should reject Harris's argument for this reason alone.

¶ 80    More importantly, I believe the majority usurps the legislature's role in concluding that the consecutive sentencing and mandatory enhancement sentencing statutes are unconstitutional as applied to Harris. This court has routinely acknowledged that the convergence of these sentencing statutes often operates to produce de facto life sentences. See *Decatur*, 2015 IL App (1st) 130231, ¶ 18; *Gipson*, 2015 IL App (1st) 122451, ¶ 61. But it is for the legislature, and not the courts, to revisit the sentencing scheme and afford greater discretion to trial judges. *People v. Huddleston*, 212 Ill. 2d 107, 129 (2004) (recognizing the legislature's power to prescribe mandatory sentences).

¶ 81    Harris's 76-year sentence was the minimum sentence that the trial court could impose: 20 years for first degree murder (730 ILCS 5/5-4.5-20(a) (West 2008) (providing for a sentencing range of 20 to 60 years)); plus the mandatory enhancement for personally discharging a firearm

(730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008) (25 years to life)); 6 years for attempt first degree murder (730 ILCS 5/5-4.5-25(a) (West 2008) (providing for a sentencing range of 6 to 30 years)); plus the minimum 25-year enhancement, to run consecutively (730 ILCS 5/5-8-4(d)(1) (West 2008)). The trial court could have imposed a life sentence, but exercised its discretion to instead impose the minimum term authorized by law. The trial court is simply not at liberty to impose a lesser sentence on remand. And while I share the majority's concern over the length of Harris' minimum prison sentence, the remedy lies with the legislature, not in *ad hoc* determinations made by this court or by trial judges.

¶ 82        I find the majority's reliance on *House* inapposite. In *House*, the defendant was found guilty of first degree murder under a theory of accountability. In finding defendant's mandatory sentence of natural life unconstitutional, this court stated: "Given [the] defendant's age, his family background, his actions as a lookout as opposed to being the actual shooter, and lack of any prior convictions, we find that defendant's mandatory sentence of natural life shocks the moral sense of the community." *House*, 2015 IL App (1st) 110580, ¶ 101. The court noted that the defendant never knew his father, was raised by his grandmother and that his mother died when he was 18, about a year before his offenses.

¶ 83        The same author distinguished *House* in *People v. Ybarra*, 2016 IL App (1st) 142407, a case more factually similar to this case. In *Ybarra*, the court sentenced the 20-year-old defendant to a mandatory term of natural life imprisonment after a jury convicted him of three counts of first degree murder. *Id.* ¶ 1. This court rejected the defendant's claim that his sentence violated the proportionate penalties clause and distinguished its decision in *House*. Specifically noting that the defendant in *House* was found guilty under a theory of accountability, the court observed that a "significant difference" in *Ybarra* was that defendant pulled the trigger. *Id.* ¶ 27. Thus,

even though defendant's presentence investigation report indicated that he grew up in extreme poverty, his father was a gang member and abused drugs and defendant had a low IQ and developmental disabilities, the court nevertheless concluded that his sentence did not violate the proportionate penalties clause. *Id.* ¶ 30.

¶ 84　　　　Like the defendant in *Ybarra*, Harris fired the weapon that killed Moore and injured Woulard. That alone distinguishes this case from *House*. Further, based on the presentence investigation report in the record, Harris's upbringing and family background are not mitigating factors. Harris was raised in a two-parent household, reported no mental health issues (except depression over his pending case), and disclaimed any use of drugs or alcohol. Further, unlike *Gipson*, also cited by the majority, it is not readily apparent that Harris's conduct was the product of "rash decision making." *Gipson*, 2015 IL App (1st) 122451, ¶ 73. According to the evidence, Harris requested a ride to the BP Station from Aaron Jones and when he arrived there, exited the car and immediately began shooting. Such evidence implies premeditation rather than a spur-of-the-moment decision.

¶ 85　　　　The majority's rationale is based on two factors: Harris's age and his lack of any criminal background. But as the Supreme Court recognized in *Roper v. Simmons*, 543 U.S. 551, 574 (2005):

> "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. *** [H]owever, a line must be drawn. *** The age of 18 is the point where society draws the line for many purposes between childhood and adulthood."

If Harris's sentence violates the proportionate penalties clause, then there is no line to be drawn for sentencing purposes. The same proportionate penalties clause argument could be advanced by a 20-year-old, a 25-year-old or a 30-year-old defendant who had no prior criminal convictions. And while a compelling argument can be made that vesting greater sentencing discretion in trial courts would result in fewer de facto life sentences for young offenders, the legislature has not chosen to do so.

Because I do not believe Harris has established a violation of the proportionate penalties clause, I would affirm his sentence.